**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 00-60111

ERNEST ISKANDAR NEHME,

Petitioner,

VERSUS

IMMIGRATION AND NATURALIZATION SERVICE,

Respondent.

Petition for Review of an Order of the
Board of Immigration Appeals

June 5, 2001

Before KING, Chief Judge, and HIGGINBOTHAM and DUHÉ, Circuit Judges.

DUHÉ, Circuit Judge:

In this case we are called upon primarily to decide whether Congress complied with the Constitution's mandate of uniformity when it established the rules of derivative naturalization under former § 321 of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1432 (2000). We hold that Congress has done so, and that Petitioner has failed to prove that he was ever naturalized under this or any other section of the INA. Petitioner is therefore an alien, and because he is removable by reason of having committed an aggravated felony, we lack jurisdiction pursuant to 8 U.S.C. § 1252(a)(2)(C). Accordingly, we DISMISS his petition.

# I.

## BACKGROUND

Petitioner Ernest Iskander Nehme ("Nehme") was born in 1963 in Lebanon to parents who were Lebanese citizens. He emigrated to the United States in 1970 as a lawful permanent resident, and resided in Pennsylvania with his parents. In 1980, when Nehme was sixteen, his father became a naturalized citizen. At that time, Nehme's parents were informally separated, and his mother lived on and off with the family. However, his parents never obtained a judicial separation or custody decree, and because of their religious beliefs, they never divorced. Throughout this time, Nehme resided continuously with his father in Pennsylvania. His mother eventually became a naturalized citizen in 1987, when Nehme was twenty-three years old.

In 1999, the Immigration and Naturalization Service ("INS") commenced deportation proceedings against Nehme, charging him with removability under 8 U.S.C. § 1227(a)(2)(A)(iii), as an alien convicted of an aggravated felony.[1] Before the Immigration Judge ("IJ"), Nehme argued that he had automatically become a naturalized citizen under former 8 U.S.C. § 1432 when his father was naturalized, and therefore he was not subject to deportation. Section 1432 provided in pertinent part:

> (a) A child born outside of the United States of alien parents . . . becomes a citizen
> of the United States upon fulfillment of the following conditions:
>     (1) The naturalization of both parents; or
>
>                    * * *
>     (3) The naturalization of the parent having legal custody of the child
>     when there has been a legal separation of the parents . . . ; and if
>     (4) Such naturalization takes place while such child is under the age
>     of eighteen years; and
>     (5) Such child is residing in the United States pursuant to a lawful

---

[1] Nehme had been convicted of cocaine distribution in 1993, which is an "aggravated felony" for purposes of the INA. See 8 U.S.C. § 1101(a)(43).

2

admission for permanent residence at the time of the naturalization of the parent last naturalized under clause (1) of this subsection, or the parent naturalized under clause . . . (3) of this subsection, or thereafter begins to reside permanently in the United States while under the age of eighteen years.

Nehme conceded to the IJ that by the time his father became a naturalized citizen, Pennsylvania had abolished the judicial mechanism known as "legal separation" of married persons. However, a couple could obtain a divorce in Pennsylvania if they lived apart with the intent to cease cohabitation as husband and wife. Nehme argued that because a formal process of "legal separation" did not exist in Pennsylvania in1980, and because his parents had actually separated and met the prerequisite for divorce, his parents were "legally separated" under Pennsylvania law. Consequently, he had been automatically naturalized under § 1432 when his father naturalized, because at that time he was (1) in the actual, uncontested custody of his father, (2) under eighteen and (3) residing in the United States as a permanent resident.[2]

The IJ rejected Nehme's argument, finding that his parents had never obtained a legal separation when that process existed under Pennsylvania law, and that at the time of his father's naturalization in 1980, legal separation was no longer possible in that state. The IJ then ordered that Nehme be deported, and he appealed his case to the Board of Immigration Appeals ("BIA"). The BIA adopted the IJ's decision and dismissed the appeal.

Nehme now petitions this court to review the BIA's decision. He argues that the decision of the IJ and the BIA that Nehme's citizenship should be determined by reference to Pennsylvania law rather than federal standards was arbitrary, capricious, and contrary to INS precedent. He also

---

[2]By the time Nehme's mother was naturalized, Nehme was over eighteen years of age and would not have qualified for derivative naturalization under § 1432(a)(1) (naturalization of both parents).

3

contends that the legal separation requirement in former 8 U.S.C. § 1432(a)(3) is not a "uniform Rule of Naturalization" as required by Article I, Section 8, Clause 4 of the Constitution. Finally, he argues that the Child Citizenship Act of 2000, which repealed § 1432 and removed the "legal separation" requirement from the rules of derivative naturalization, should be applied to him retroactively.

II.

ANALYSIS

A.     Jurisdictional Requirements and Standard of Review

We must begin by determining whether we have jurisdiction to review the BIA's decision. We review our jurisdiction de novo. Lopez-Elias v. Reno, 209 F.3d 788, 791 (5th Cir. 2000), cert. denied, 121 S. Ct. 757, 148 L. Ed. 2d 660 (2001). Congress has specifically commanded in 8 U.S.C. § 1252(a)(2)(C) that no court has jurisdiction to review deportation orders for aliens who are removable because they were convicted of aggravated felonies. Nonetheless, we always have jurisdiction to consider whether the specific conditions exist that bar our jurisdiction over the merits, namely, whether the petitioner is (1) an alien, (2) who is deportable, (3) for committing the type of crime that bars our review. Max-George v. Reno, 205 F.3d 194, 199 (5th Cir. 2000) (quoting Richardson v. Reno, 180 F.3d 1311, 1315 (11th Cir. 1999)). Moreover, we "must determine whether the particular provisions classifying the petitioner under the jurisdiction-stripping provision . . . are being constitutionally applied." Id. at 199-200. Therefore, for jurisdictional purposes only, we may determine whether Nehme may be properly classified as an alien.

However, the INS argues that Nehme must overcome a second jurisdictional hurdle imposed by Congress in 8 U.S.C. § 1252(d)(1). That section provides that a court may review a final order of removal only if the alien has exhausted all his administrative remedies. We have stated that when

4

exhaustion is statutorily mandated, it is a jurisdictional requirement. Townsend v. INS, 799 F.2d 179, 181 (5th Cir. 1986). See also Witter v. INS, 113 F.3d 549, 554 (5th Cir. 1997) ("We have no jurisdiction to consider issues that were not presented to or considered at the administrative level on appeal."). The INS correctly points out that before the IJ and the BIA, Nehme did not challenge the application of Pennsylvania law to his case, in fact, he assumed Pennsylvania law should govern. Likewise, he never challenged the constitutionality of the derivative naturalization rules in 8 U.S.C. § 1432. Therefore, he should not be permitted to object to the application of state law or to the validity of § 1432 on appeal.

The exhaustion requirement in 8 U.S.C. § 1252(d)(1) appears to be triggered only when we would otherwise have jurisdiction over the merits of Nehme's petition for review. However, we need not decide that issue for several reasons. First, our determination whether we have jurisdiction under the bar in 8 U.S.C. § 1252(a)(2)(C) will effectively decide the merits of this case. If Nehme is not an alien, then we must conclude both that we have jurisdiction, and that Nehme is not deportable. And, as we have already stated, in order to make this determination we may examine, de novo, (1) whether Nehme is an alien under the terms of INA, and (2) whether "the particular provisions classifying [him] under the jurisdiction-stripping provision . . . are being constitutionally applied." Max-George, 205 F.3d at 199-200. Under that formulation, we may consider Nehme's arguments that he became a citizen under § 1432, and if he did not, whether that provision is unconstitutional. However, we may not consider his specific claim that the decision of the BIA was arbitrary, capricious and contrary to INS precedent because that claim addresses the merits of the BIA's decision.

Second, even if the statutory exhaustion requirement applies, we would reach the same result.

5

The BIA does not have jurisdiction to decide the constitutionality of acts of Congress. See Johnson v. Robison, 415 U.S. 361, 368, 94 S. Ct. 1160, 1166, 39 L. Ed. 2d 389 (1974). Therefore, Nehme would not be required to have exhausted his constitutional arguments before the BIA. Cf. Anwar v. INS, 116 F.3d 140, 144 n.4 (5th Cir. 1997); see also Singh v. Reno, 182 F.3d 504, 511 (7th Cir. 1999). Moreover, the Child Citizenship Act of 2000 became effective after Nehme's appeal to the BIA, so he could not have previously argued for its application. However, the exhaustion requirement prevents him from raising his arbitrary and capricious claim for the first time on appeal.

Finally, before proceeding with our analysis, we pause to consider the INS's contention that we should give Chevron deference to its interpretation of the INA in the course of our jurisdictional inquiry. See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-44, 104 S. Ct. 2778, 2781-82, 81 L. Ed. 2d 694 (1984). The INS's contention lacks merit. In Lopez-Elias, we stated that Chevron deference is not due "with respect to the enforcement of this court's jurisdictional limitations." 209 F.3d at 791. "[T]he determination of our jurisdiction is exclusively for the court to decide." Id.

B.    Naturalization under 8 U.S.C. § 1432

As we have already observed, Nehme's argument before this court is somewhat different from the argument he made in the administrative proceeding. In that proceeding, he argued that his parents had been "legally separated" in the eyes of Pennsylvania law when his father became a naturalized citizen in 1980. He contended, therefore, that he had been automatically naturalized at that time under 8 U.S.C. § 1432. At oral argument before this court, Nehme reiterated his position that his parents were "legally separated" for the purposes of § 1432(a)(3). However, he now justifies this conclusion because of the Constitution's requirement that Congress establish "uniform Rules of

6

Naturalization." U.S. Const., art. I, § 8, cl. 4. Specifically, Nehme asserts that requiring the judicial separation of the parents as a predicate for the naturalization of the child makes citizenship depend on the law of the state of the family's residence, rather than on a federal standard. Consequently, § 1432(a)(3) could not have a uniform operation throughout the United States, because not all states provide for judicial separation, and even among the states which do provide for it, the relevant laws vary. Nehme objects that in some states, like Pennsylvania, parents would have to be divorced for their children to be naturalized under § 1432, but in others, judicial separation would suffice.[3] Therefore, in his briefs, Nehme argued that the legal separation requirement should be read out of §1432(a)(3), so that § 1432(a)(3) may operate uniformly and constitutionally in every state. At oral argument, he proposed an alternative construction whereby "legal separation" should mean "consensual separation not engendered by an illegal act." Under this reading of the term, his parents would have been "legally separated" in 1980 because they voluntarily lived apart under lawful circumstances.

Our task is to determine whether Congress has provided that an alien in Nehme's situation could be automatically naturalized under § 1432, and if not, whether § 1432 is a uniform rule of naturalization as required by the Constitution. For ease of analysis, we will first determine what the term "legal separation" in § 1432(a)(3) means. Next, we will consider what the constitutional mandate of uniformity requires in the context of naturalization laws, and finally whether the legal separation requirement conforms with the uniformity requirement. Our conclusions will dictate whether Nehme is a citizen or an alien, and consequently, whether we have jurisdiction in this case.

1.     "Legal Separation"

---

[3]The parties agree that an absolute divorce would satisfy the legal separation requirement.

7

While Nehme asserted at oral argument that we must interpret "legal separation" to mean essentially "de facto separation," the INS argued that the term should be defined according to state law. We start with the general assumption that in absence of plain language to the contrary, Congress does not make the application of a federal act dependent on state law. Mississippi Band of Choctaw Indians v. Holyfield, 490 U.S. 30, 43, 109 S. Ct. 1597, 1605, 104 L. Ed. 2d 29 (1989) (quoting Jerome v. Unites States, 318 U.S. 101, 104, 63 S. Ct. 483, 485, 87 L. Ed. 640 (1943)). One justification for this rule is that Congress intends that federal statutes have a nationwide application. Choctaw Indians, 490 U.S. at 43, 109 S. Ct. at 1605-06. "Accordingly, the cases in which we have found that Congress intended a state-law definition of a statutory term have often been those where uniformity clearly was not intended." Id. at 43-44, 109 S. Ct. at 1606. Another reason for the general presumption is that permitting state law to control a federal act might impair a federal program. Id. at 44, 109 S. Ct. at 1606. Therefore, we must look to the purpose of the federal statute to ascertain congressional intent. Id.

We are also mindful of the rule that where an interpretation of a statute would raise serious constitutional concerns, we must construe the statute to avoid those problems unless our construction is plainly contrary to the will of Congress. Solid Waste Agency v. United States Army Corps of Eng'rs, __ U.S. __, 121 S. Ct. 675, 683 (2001). Therefore, we must interpret § 1432(a)(3) in light of the constitutional requirement of uniformity. In re Edgar, 253 F. Supp. 951, 953 (E.D. Mich. 1966). It appears that the majority of the courts considering the issue have applied these interpretive principles to conclude that our naturalization laws should be construed according to a federal, rather than state, standard. See, e.g., Fierro v. Reno, 217 F.3d 1, 3-4 (1st Cir. 2000) ("What is meant by the phrase 'having legal custody of the child' [in § 1432] is, of course, a question of federal statutory

8

interpretation."); <u>Nemetz v. INS</u>, 647 F.2d 432, 435 (4th Cir. 1981) ("We agree with Nemetz that whether a person is of good moral character for purposes of naturalization is a question of federal law."); <u>Edgar</u>, 253 F. Supp at 953 ("[I]n reaching [a] decision upon the meaning of the federal act we are not remitted to a patchwork of state laws . . . ."); and <u>In re Briedis</u>, 238 F. Supp. 149, 150 (N.D. Ill. 1965) ("[Defining adultery according to state law] would lead to an absurd patchwork result, resting a petitioner's right to United States citizenship upon the whims and idiosyncracies of individual state legislatures.").[4]

Some courts, while endorsing adherence to uniform federal standards, have nevertheless held that those standards can be informed by state law. In an opinion interpreting the same statutory provision at issue in this case, the Seventh Circuit reasoned that while the term "legal separation" must take its meaning from federal law, it was appropriate for federal law to look to state or foreign law for a rule of decision. <u>Wedderburn v. INS</u>, 215 F.3d 795, 799 (7th Cir. 2000), <u>cert. denied</u>, 121

---

[4]<u>But see</u> <u>In re Longstaff</u>, 538 F. Supp. 589, 591 n.1 (N.D. Tex. 1982), <u>aff'd on other grounds</u>, 716 F.2d 1439 (5th Cir. 1983) (defining "good moral character" for naturalization according to Texas criminal law, and stating "We do not disagree with the idea of a uniform rule. Rather, we hold the uniform rule is . . . that of 'good moral character.'"). Courts have also endorsed using federal, instead of state, standards to interpret federal laws regulating immigration. <u>See</u> <u>Wilson v. INS</u>, 43 F.3d 211, 214-15 (5th Cir. 1995) (acknowledging the general rule that federal law governs the application of congressional enactments in the absence of a directive to the contrary); <u>Ye v. INS</u>, 214 F.3d 1128, 1132-33 (9th Cir. 2000) (using a federal common law definition of "burglary" to determine if petitioner had been convicted of a deportable offense); <u>Kahn v. INS</u>, 36 F.3d 1412, 1415 (9th Cir. 1994) (interpreting the term "family ties" as a factor to be considered in granting discretionary relief from deportation, and holding "the Board must apply a flexible, uniform standard that reflects the federal policies underlying §212(c) [of the INA]."); <u>Moon Ho Kim v. INS</u>, 514 F.2d 179, 181 (D.C. Cir. 1975) (interpreting "adultery" for the purpose of eligibility for voluntary departure, and holding that "the appropriate approach is the application of a uniform federal standard."). <u>But see</u> <u>Brea-Garcia v. INS</u>, 531 F.2d 693, 696-97 (3rd Cir. 1976) (using state law to define "adultery" in the absence of a federal definition, and suggesting that "[a]rguably, Congress intended to defer to the state in which an alien chooses to live for the precise definition . . . for it is that particular community which has the greatest interest in its residents' moral character.").

9

S. Ct. 1226 (2001). Similarly, in Nemetz, the Fourth Circuit determined that in order to devise a federal standard for determining whether an alien has engaged in acts precluding a finding of "good moral character" for naturalization, a court may look initially to state criminal law. Nemetz, 647 F.2d at 436. For crimes that were treated uniformly throughout the country, the court believed that "state law will be the best barometer of the conscience of the country as a whole." Id. However, the court devised its own federal standard for certain private acts that were criminalized in only some of the states. Id.[5]

We agree that in interpreting a federal statutory term, a court may devise a federal rule by reference to state law. However, we reject any contention that the law of any one state should govern the determination whether an alien child's parents were "legally separated." The INS cites the Supreme Court's decision in De Sylva v. Ballentine, 351 U.S. 570, 76 S. Ct. 974, 100 L. Ed. 1415 (1956) as support for the IJ's determination that the question of legal separation was governed by Pennsylvania law. However, we find that case is distinguishable. There, the Court interpreted the term "children" in § 24 of the Copyright Act. The Court acknowledged that the inquiry was a matter of federal law, but because there is no federal law of domestic relations, it turned to state law for a definition. Id. at 580, 76 S. Ct. at 980. However, the Court found that the law of one particular state was controlling, and that was the state where the parties' relationships were centered. Id. at 581, 76 S. Ct. at 980. While this approach may have been appropriate in the context of copyright law, we think it is not appropriate in the area of naturalization law, where the Constitution specifically

---

[5]See also In re Johnson, 292 F. Supp. 381, 383-84 (E.D.N.Y. 1968) (considering the meaning of "adultery" for purposes of determining good moral character, and concluding that "the statutory design seems to have been to provide for reference to state law, at least as a point of departure," as modified by those federal standards required to ensure uniformity.).

commands that Congress legislate <u>uniform</u> rules of naturalization.[6]  As the Supreme Court stated in

<u>Choctaw Indians</u>, a state-law definition of a federal statutory term is appropriate only where Congress

clearly did not intend uniformity.  490 U.S. at 43-44, 109 S. Ct. at 1606.[7]

With these threshold principles in mind, we now turn to the meaning of "legal separation."

As the Supreme Court has dictated, we must look to the purpose behind § 1432 to ascertain

Congress's intent.  <u>See id.</u> at 44, 109 S. Ct. at 1606.  The predecessor statute to § 1432 originally

provided that a child born abroad of alien parents would automatically be deemed a citizen by virtue

of the naturalization of <u>either</u> of his parents, beginning five years after the child began to reside

permanently in the United States.  Act of March 2, 1907, ch. 2534, § 5, 34 Stat. 1228 (1907)

(codified at former 8 U.S.C. § 8) (as amended by the Act of May 24, 1934, ch. 344, § 2, 48 Stat. 797

(1934)).[8]  This section was amended by the Nationality Act of 1940, when for the first time, Congress

explicitly required the naturalization of both parents, unless the parents had been legally separated and

---

[6]Although the First Circuit cited <u>De Sylva</u> in its opinion in <u>Fierro</u>, 217 F.3d at 4, it held that "the requirement of 'legal custody' in § 1432 should be taken <u>presumptively</u> to mean legal custody under the law of the state in question." (emphasis added).  However, despite this presumption, the court refused to give effect to a state nunc pro tunc custody order because, in part, it would have allowed "the state court to create loopholes in the immigrations laws," <u>id.</u> at 6, and this "reflect[ed] an approach to defining legal custody that is not consistent with section 1432."  <u>Id.</u> at 4.

[7]We think it important to note that, consistent with our reasoning that federal standards should govern the interpretation of naturalization laws, Congress has explicitly provided federal definitions for such domestic relations terms as "parent" and "child" as they are used in the subchapter containing § 1432.  <u>See</u> 8 U.S.C. § 1101(c)(1) and (2).

[8]There appears to have been another, somewhat overlapping section of the United States Code that addressed the naturalization of children who already resided in the United States at the time of the naturalization "of their parents."  Act of Apr. 14, 1802, ch. 28, § 4, 2 Stat. 155, (1802) (Rev. Stat. § 2172, codified at former 8 U.S.C. § 7).  However, this provision may not have operated prospectively to persons naturalized after 1802.  <u>See</u> <u>United States ex rel. Guest v. Perkins</u>, 17 F. Supp. 177, 179 (D.D.C. 1936).  It was later amended and consolidated with § 5 of the 1907 Act by the Nationality Act of 1940.

11

the parent with legal custody obtained naturalization. Nationality Act of 1940, Pub. L. No. 76-853, ch. 876, § 314, 54 Stat. 1137, 1145-46 (1940) (codified at former 8 U.S.C. § 714). The legislative history behind this particular change is sparse, but it is clear that the overall intent behind the 1940 Act was to make it more difficult for aliens to obtain United States citizenship. Congress was concerned about the burden on the United States government and its agencies of protecting persons who were only "nominal" citizens of this country and whose "real interests," as demonstrated by their residence abroad, was not in the United States. S. Rep. No. 76-2150, at 4 (1940). Moreover, Congress found especially problematic the number of dual nationals who resided in foreign countries while also claiming the protections of the United States. Id.; see also 86 Cong. Rec. 11945-46 (1940) (debate of H.R. 9980). Accordingly, the Deputy Commissioner of the INS testified that the changes contained in the 1940 Act rendered the rules governing the automatic naturalization of alien children "much stricter" than under prior law. To Revise and Codify the Nationality Laws of the United States into a Comprehensive Nationality Code: Hearings Before the House Comm. on Immigration and Naturalization, 76th Cong. 90-91 (1940) (hereinafter "Hearings") (statement of Thomas B. Shoemaker, Deputy Commissioner of Immigration and Naturalization).[9]

_____

[9]An explanatory commentary by the Committee of Advisers who submitted the draft Nationality Code to the Executive Branch (reprinted in Hearings, at 445) attributes the legal custody and legal separation conditions to the decision in In re Lazarus, 24 F.2d 243 (N.D. Ga. 1928) and an Attorney General opinion (37 Op. Atty. Gen. 90 (1933)). Both the Lazarus court and the Attorney General opinion examined § 5 of the 1907 Act, which provided for the automatic naturalization of an alien child upon the "naturalization of or resumption of American citizenship by the parent." The court held that because "[t]otal divorce . . . terminates the marital relation," the alien daughter of a divorced woman who resumed her American citizenship by naturalization would also be naturalized. 24 F.2d at 244. Interestingly, the court explicitly declined to decide the effect of the law on alien children where only one, undivorced parent obtained naturalization, even though the law at the time provided for the automatic naturalization of the child upon the naturalization of simply "the parent." Id. The 1933 Attorney General opinion reasoned that a mother was the "parent" under § 5 of the 1907 Act only because she had obtained an absolute divorce from her child's alien father. 37 Op.

This history indicates that Congress wanted to ensure that only those alien children whose "real interests" were located in America with their custodial parent, and not abroad, should be automatically naturalized. We also think Congress could have rationally concluded that requiring the naturalization of both parents of the alien child, when the parents remain married, was necessary to promote marital and family harmony and to prevent the child from being separated from an alien parent who has a legal right to custody. See Fierro, 217 F.3d at 6. Moreover, acquiring American citizenship usually means disavowing one's original citizenship and can involve serious consequences such as military service or tax obligations. See Wedderburn, 215 F.3d at 800. It makes sense, therefore, that when the child's parents are still married, the child does not automatically acquire a new citizenship upon the naturalization of only one parent. Given these considerations, we think Congress clearly intended that the naturalization of only one parent would result in the automatic naturalization of an alien child only when there has been a formal, judicial alteration of the marital relationship.[10]

We have already stated that our formulation of a federal standard by which to interpret the

_____

Atty. Gen. At 94. However, in 1934, § 5 of the 1907 Act was amended to permit the automatic naturalization of the child upon "the naturalization of or resumption of American citizenship by the father or the mother" (emphasis added). Examining this provision, the court in Ex rel. Guest considered the case of a mother who had separated from her husband by mutual consent, with an agreement that she should have custody of their child. 17 F. Supp. at 180. The court held that she fell within the provisions of the 1934 Act and her child could be automatically naturalized when she resumed her American citizenship. Id. The Committee of Advisers appears to have overlooked this intervening statutory change.

[10]In Espindola v. Barber, 152 F. Supp 829 (N.D. Cal. 1957), the court observed that a Senate committee investigating immigration laws in 1950 concluded that under the 1940 Act, the naturalized parent must have been judicially separated and have had sole legal custody of the child in order for the child to be automatically naturalized. A private separation agreement would not have sufficed. Id. at 831 (citing S. Rep. No. 81-1515, at 709 (1950)).

term "legal separation" may also be informed by state law, particularly in this case, where there is no ready-made, federal body of law on domestic relations. We have identified four states that have a statutory definition of the terms "legal separation" or "legally separated." In each case, the statutory definition requires a judicial sanction. See Ala. Code § 30-2-40(b) (2000) ("A legal separation is a court determination of the rights and responsibilities of a husband and wife arising out of the marital relationship.); Del. Code Ann. tit. 13, § 901(8) (2000) ("'Legally separated' means any persons or persons who, by a decree of the appropriate court of any other state of the United States . . . has been accorded the right to reside separate and apart from his or her spouse, or is a party to a decree of divorce from bed and board or its equivalent."); Minn. Stat. Ann. § 518.06 (1) (West 2000) (same as Alabama); and Neb. Rev. Stat. § 42-347(3) ("Legal separation shall mean a decree of a court of competent jurisdiction providing that two persons who have been legally married shall thereafter live separate and apart . . . ."). Another eighteen states or territories have a statutory mechanism called "legal separation," and in each case the relevant laws contemplate a judicial decree.[11]

We think these state laws make it clear that in the United States, the term "legal separation" is uniformly understood to mean judicial separation. See also Wedderburn, 215 F.3d at 799 ("[D]omestic relations law in the United States treats 'legal separation' as the judicial suspension or

---

[11]See Ariz. Rev. Stat. Ann. § 25-313 (West 2000); Cal. Fam. Code § 2330 (West 2000); Colo. Rev. Stat. Ann. § 14-10-106 (West 2000); Conn. Gen. Stat. Ann. § 46b-40 (West 2000); D.C. Code Ann. § 16-904 (1998); 750 Ill. Comp. Stat. Ann. 5/402 (West 2000); Ind. Code Ann. § 31-15-3-2 (West 2000); Ky. Rev. Stat. Ann. § 403.230 (Banks-Baldwin 2000); Mo. Ann. Stat. § 452.305 (West 2000); Mont. Code Ann. § 40-4-104 (2000); N.H. Rev. Stat. Ann. § 458:26 (2000); Ohio Rev. Code Ann. § 3105.17 (West 2000); S.D. Codified Laws § 25-4-17.2 (Michie 2000); Tenn. Code Ann. § 36-4-102 (2000); Vt. Stat. Ann. tit. 15, § 555 (2000); 16 V.I. Code Ann. § 104 (2000); Wash. Rev. Code Ann. § 26.09.020 (West 2000); and Wis. Stat. Ann. § 767.07 (2001). This list does not include those other states which have similar judicial mechanisms called "limited divorce," "separation [or divorce] from bed and board," "judicial separation," or simply "separation."

dissolution of a marriage."). This is so even though not every state provides for legal separation. As the Fourth Circuit reasoned in Nemetz, because the process is treated fairly uniformly throughout the country, state law may be the "best barometer of the conscience of the country as a whole." 647 F.2d at 436. Moreover, adopting a definition that does not contemplate a judicial decree, as Nehme would have us do, would lead to an absurd result: every husband and wife who are voluntarily apart from one another under legal circumstances would be "legally separated." Such an interpretation leaves no real meaning for the word "legal,"and is at odds with a common sense understanding of legal separation. See Wedderburn, 215 F. 3d at 799; Charles v. Reno, 117 F. Supp. 2d 412, 418 (D. N.J. 2000).

Finally, we note that our interpretation is in accord with the INS's official interpretation of § 1432, which, for some reason, appears not to have been cited by either the IJ or the INS in its briefs. The interpretation does not provide that the law of any particular state should control. See INS Interp. 320.1(6) ("Legal custody of the child . . . may follow judicial proceedings, which terminate the marriage completely, as by absolute divorce, or which merely separate the parties without destroying the marital status."). See also Matter of H, 3 I. & N. Dec. 742, 744 (C.O. 1949) (endorsing the view that "legal separation" means "either a limited or absolute divorce obtained through judicial proceedings.").

The IJ was correct to some extent in looking to Pennsylvania law to determine whether Nehme had been naturalized under § 1432, because that was where Nehme's parents lived and where they would have been most likely to obtain a separation decree. However, the fact that legal separation was no longer possible in Pennsylvania in 1980 does not end the inquiry, because we have rejected the proposition that the law of any one state should be controlling in this case. However,

15

Nehme has presented no evidence that his parents would have been considered legally separated in any state under the federal standard that we have formulated.[12]  Therefore, we conclude that he did not meet the requirements of § 1432 and consequently he never became a naturalized citizen.

2.      The Naturalization Clause

Having formulated a definition of "legal separation," we now turn to the history and meaning of the uniformity requirement in the Naturalization Clause to decide § 1432's constitutionality.  Under the Articles of Confederation, citizenship was entirely subject to state control.  U.S. Term Limits v. Thornton, 514 U.S. 779, 872, 115 S. Ct. 1842, 1888, 131 L. Ed. 2d 881 (1995) (Thomas, J., dissenting).  The diversity of state immigration policies led James Madison to observe in The Federalist No. 42 that:

> The dissimilarity in the rules of naturalization has long been remarked as a fault in our system, and as laying a foundation for intricate and delicate questions. . . . In one State, residence for a short term confirms all the rights of citizenship: in another, qualifications of greater importance are required. . . . We owe it to mere casualty, that very serious embarrassments on this subject have been hitherto escaped.  By the laws of the several Sates, certain descriptions of aliens, who had rendered themselves obnoxious, were laid under interdicts inconsistent not only with the rights of citizenship but with the privilege of residence.  What would have been the consequence, if such persons, by residence or otherwise, had acquired the character of citizens under the laws of another State, and then asserted their rights as such, both to residence and citizenship, within the State proscribing them?

Madison explained that to avoid such consequences, the Constitution authorized the federal government to establish uniform rules of naturalization throughout the United States.  This power, along with the power to establish uniform laws of bankruptcy, would tend to "facilitate the

---

[12]Nehme also has not demonstrated that his parents' informal separation would have constituted a "legal separation" in any state, including Pennsylvania.

16

intercourse between the States." Id.

As early as the 1880's, federal courts held that in the bankruptcy context, the uniformity rule merely requires Congress to pass one law applicable to all states of the union. Darling v. Berry, 13 F. 659, 667-68 (C.C.D. Iowa 1882). A law is uniform even though it operates differently in different states, because Congress "cannot create uniform conditions and circumstances in the various states of the Union." Id. at 668. The Supreme Court has referred to this requirement as one of "geographical uniformity," as opposed to personal uniformity. Hanover Nat'l Bank v. Moyses, 186 U.S. 181, 188, 22 S. Ct. 857, 860-61, 46 L. Ed. 1113 (1902).[13] "The general operation of the law is uniform although it may result in certain particulars differently in different states." Id. at 190, 22 S. Ct. at 861. Thus, the Supreme Court has noted that a federal bankruptcy law which recognizes and enforces state laws affecting exemptions and priorities of payment is a uniform law, even though the law may operate differently from state to state. Stellwagen v. Clum, 245 U.S. 605, 613, 38 S. Ct. 215, 217, 62 L. Ed. 507 (1918). In more recent times, the Court has stated that the uniformity requirement is not a "straightjacket" prohibiting Congress "from recognizing that state laws do not treat commercial transactions in a uniform manner." Railway Labor Executives' Ass'n v. Gibbons, 455 U.S. 457, 469, 102 S. Ct. 1169, 1176, 71 L. Ed. 2d 335 (1982).

Although there is very little case law on the matter, we think that this construction of the

---

[13]The concept of "geographical uniformity" as opposed to personal or "true" uniformity appears to have first emerged in the Supreme Court's tax cases. See, e.g., Knowlton v. Moore, 178 U.S. 41, 96, 20 S. Ct. 747, 769, 44 L. Ed. 969 (1900) ("The proceedings of the Continental Congress also make it clear that the words 'uniform throughout the United States' . . . [were used] always with reference purely to a geographical uniformity and as synonymous with the expression 'to operate generally throughout the United States.'"; see generally In re Sullivan, 680 F.2d 1131, 1134 (7th Cir. 1982).

uniformity requirement also applies to naturalization law.[14]  Such a construction is entirely consistent with the concerns of the Constitution's framers, as expressed by Madison in The Federalist, that there should be a single, federal body of rules for naturalization.  In Kharaiti Ram Samras v. United States, 125 F.2d 879, 881 (9th Cir. 1942), the Ninth Circuit declared that the Constitution's uniformity rule for naturalization "relates to geography only."  Therefore, a law limiting naturalization to persons of the "White Race or of African nativity or descent" was valid, because it was uniformly applicable to all the states even though it did not extend naturalization uniformly to all races.  Id. at 880-81.  This reasoning was adopted in In re Lee Wee, 143 F. Supp 736, 737-38 (S.D. Cal. 1956), which dealt with a portion of the INA that provided that no alien could be deemed to have a "good moral character" if he had been convicted of two or more gambling offenses.  The court held that the law was uniform even though a person who lived in a city where gambling was permitted might be entitled to naturalization, whereas in another city, gambling could result in a criminal conviction and a denial of citizenship.  Id. at 738.[15]

These cases are consistent with the decisions holding that the Constitution's uniformity rule means that naturalization laws must be interpreted according to federal standards, rather than state law.  In Nemetz, 647 F.2d at 435, the Fourth Circuit considered whether the petitioner's homosexual activity constituted a "crime of moral turpitude" precluding naturalization.  The court observed that the petitioner's conduct constituted a crime in his home state, but not in states that had decriminalized

---

[14]But see Sullivan, 680 F.2d at 1135 (observing that the naturalization clause has not been interpreted to require only geographic uniformity).

[15]See also Morgan v. Virginia, 328 U.S. 373, 388-89, 66 S. Ct. 1050, 1059, 90 L. Ed. 1317 (1946) (Frankfurter, J., concurring) (indicating that the power to establish uniform rules of naturalization requires geographic uniformity).

private, consensual sodomy. Therefore, it was simply an "accident of geography" that placed his naturalization petition in jeopardy. Id. To avoid leaving the requirements for citizenship to state control, the court devised a federal standard to determine whether the petitioner had committed acts constituting a crime of moral turpitude. Id. at 435-37.[16]

Although the Fourth Circuit eschewed reliance on state law to define a federal rule when state laws on the subject were diverse, the court did not hold that a rule of naturalization, interpreted according to a federal standard, would be unconstitutional because it caused different outcomes from state to state. Thus, the federal law at issue in In re Lee Wee, which defined "good moral character" according to a federal standard (conviction of two or more gambling offenses), did not lack uniformity because gambling was a crime in less than all the states. 143 F. Supp at 738. We conclude, therefore, that the Constitution simply requires Congress to enact rules of naturalization that apply uniformly throughout the United States, even though those uniform federal rules may produce results that differ by state.

Constitutionality of § 1432(a)(3)

Given our construction of the uniformity requirement in the Naturalization Clause, we see no reason why § 1432(a)(3) is constitutionally infirm. The requirement of geographic uniformity has been satisfied because the "legal separation" requirement is applicable with equal force, and has the same meaning, in every state. However, what constitutes a "legal separation" is not to be decided

---

[16]See also Johnson, 292 F. Supp. at 384 (considering the meaning of "adultery" for purposes of determining good moral character, and holding that the law to be applied was state law "as modified by those standards of a federal nature which are necessary to assure minimal uniformity and fairness."); and Briedis, 238 F. Supp. at 151 (also considering "adultery," and holding that under Article I, Section 8, Clause 4 of the Constitution, "the better view is to develop a uniform federal standard when interpreting a statute relating to the federal right to citizenship.").

state by state; rather, it is a federal standard. But considering that the uniformity rule does not require that naturalization laws produce the same <u>result</u> in every state, Nehme cannot complain that in Pennsylvania his parents would have had to obtain a divorce for him to have been automatically naturalized, while in other states, a legal separation would have sufficed. Therefore, we conclude that the requirement of legal separation, meaning a judicial separation, is a uniform rule of naturalization.[17]

Federal naturalization law necessarily intersects with conduct and legal relationships that have been reserved for regulation exclusively by the states. It would be impossible for Congress to legislate the rules of naturalization without some reference to state laws governing domestic relations, crime, or similar matters. Congress must formulate rules that apply to every state of the union, and these rules must be interpreted according to uniform federal standards. But a certain amount of disparity in the <u>operation</u> of federal naturalization law within the individual states is inevitable, and this unavoidable consequence does not in itself render a rule of naturalization unconstitutional. As the Seventh Circuit stated in <u>Wedderburn</u>, "[a] law does not become unconstitutional just because it does not fit 100% of the cases; mismatches between legal rules and the world at large are

_____

[17]Nehme's citation of <u>Bindczyck v. Finucane</u>, 342 U.S. 76, 72 S. Ct. 130, 96 L. Ed.100 (1951) does nothing to advance his argument. In that case, a Maryland court vacated an order of naturalization pursuant to its general power under Maryland law to set aside judgments, instead of following the federal procedures set forth in § 338 of the Nationality Act of 1940. The Supreme Court held that permitting § 338 to be supplemented by state law would make the retention of citizenship "contingent upon application of myriad discordant rules by a thousand judges scattered over the land." <u>Id.</u> at 85, 72 S. Ct. at 135. Our reasoning in the instant case is entirely consistent with the Court's holding in <u>Bindczyck,</u> because we have devised a uniform federal standard by which to define "legal separation" which is not contingent upon the application of discordant state rules. Moreover, the Maryland court's order had a much more direct impact on the right to citizenship than would a state court's grant of a legal separation.

inevitable." 215 F.3d at 800.[18]

C.      Child Citizenship Act of 2000

In supplemental briefs filed before argument in this case, Nehme urges us to apply the recently

enacted Child Citizenship Act of 2000 to conclude that he automatically became a naturalized citizen

in 1980. The Child Citizenship Act repealed § 1432 and amended § 320 of the INA (8 U.S.C. §

1431) to provide:

> (a) A child born outside the United States automatically becomes a citizen of the
> United States when all of the following conditions have been fulfilled:
>> (1) At least one parent of the child is a citizen of the United States,
>> whether by birth or naturalization.
>> (2) The child is under the age of eighteen years.
>> (3) The child is residing in the United States in the legal and physical
>> custody of the citizen parent pursuant to a lawful admission for
>> permanent residence.

Child Citizenship Act of 2000, Pub. L. No. 106-395, § 101, 114 Stat. 1631 (2000). Under this

amended section, a minor child who is a lawful permanent resident would automatically be naturalized

---

[18]Nehme suggests in his briefs that § 1432(a)(3) is unconstitutional for two additional reasons. First, relying on Sherbert v. Verner, 374 U.S. 398, 83 S. Ct. 1790, 10 L. Ed. 965 (1963), he contends that his parents were denied the free exercise of their religion under the First Amendment because the "benefit" of derivative naturalization was conditioned upon their obtaining a full divorce. We reject this argument because Nehme has no standing to complain of a denial of his parents' First Amendment rights, if there was any. See Rogers v. Brochette, 588 F.2d 1057, 1061-62 (5th Cir. 1979). Even if he had standing, we note that Nehme's ability to acquire citizenship was not contingent upon his parents obtaining a divorce. Nehme's father could have submitted a naturalization application on Nehme's behalf while he was a minor, see 8 U.S.C. § 1433, and Nehme himself could have applied for naturalization thereafter. Therefore, § 1432 was not the only mechanism by which Nehme could have obtained American citizenship. Second, Nehme complains that § 1432(a)(3) offends the Privileges and Immunities Clause of Article IV of the Constitution. This is because in those states that provide for judicial separation, an alien could qualify for derivative naturalization without his parents having to obtain a full divorce, but in states which do not permit judicial separation, he could not qualify for derivative naturalization unless his parents obtained a divorce. This argument is equally meritless because the Privileges and Immunities Clause protects citizens of one state from abuses by other states, and does not address powers, such as the granting of citizenship, of the federal government. Nevada v. Watkins, 914 F.2d 1545, 1555 (9th Cir. 1990).

21

when either one of his parents becomes a United States citizen, even if his parents were neither divorced nor legally separated, as long as the child is in the legal custody of the citizen parent. Therefore, if the Child Citizenship Act applies to Nehme, he would have become a naturalized citizen when his father was naturalized in 1980. However, § 104 of the new law provides that this amendment "shall take effect 120 days after the date of the enactment of this Act and shall apply to individuals who satisfy the requirements of section 320 . . . of the Immigration and Nationality Act, as in effect on such effective date." The Child Citizenship Act was signed by President Clinton on October 30, 2000, so the amendments to § 320 of the INA became effective on February 27, 2001.

Nehme contends that the Child Citizenship Act should be retroactively applied to bestow citizenship on any person who met the conditions of amended § 320 of the INA even before the amendments were passed. However, in Landgraf v. USI Film Products, 511 U.S. 244, 270-71, 114 S. Ct. 1483, 1499-1500, 128 L. Ed. 2d 229 (1994) the Supreme Court affirmed the general presumption against the retroactivity of laws. Nevertheless, the Court formulated a test for determining the temporal effect of a federal statute enacted after the events in suit. If "Congress has expressly prescribed the statute's proper reach," then courts must follow that command. Id. at 280, 114 S. Ct. at 1505. If, however, Congress has not expressed its intent concerning whether the statute applies retroactively, a court must determine whether the law would have an impermissible retroactive effect. A statute has such an impermissible effect when it impairs the rights a party possessed when he acted, increases his liability for past conduct, or imposes new duties with respect to transactions already completed. Id.

It is Nehme's position that § 104 of the new law contains an express congressional directive that the amendments to § 320 of the INA be applied retroactively to persons who "have in the past

22

or will at some future date satisfy the conditions required, except those already deported as aliens." Petitioner's Supplemental Brief at 6. However, conceding that the directive is not explicit, Nehme argues that the legislative history of the Child Citizenship Act demonstrates that the statute was intended to have a broad remedial effect to prevent the deportation of children who can now be recognized as citizens, despite their parents' failure to timely apply for citizenship under prior law.

We reject Nehme's argument and conclude that § 104 contains an explicit command that the amended automatic naturalization provisions only be applied to alien children who satisfy the statute's conditions on or after February 27, 2001, the relevant effective date. Two of those conditions are that the child be under eighteen years of age, and that he be in the lawful custody of the citizen parent. Because Nehme was thirty-seven years old and was obviously not in the legal custody of his father on § 104's effective date, the Child Citizenship Act does not apply to him.

Our conclusion is compelled by several factors. First, as the INS points out, Nehme's interpretation of § 104 would be reasonable only if that section provided that the amendments to § 320 applied "to individuals who satisfy the requirements of section 320 of the Immigration and Nationality Act." However, Congress expressly limited the applicability of the amendments to persons who met the requirements "as in effect on [February 27, 2001]." Interpreting § 104 to apply to persons who satisfied the requirements at any time in the past or future would thus render this final clause meaningless. This leads us to a second compelling reason for our determination. An earlier version of the bill which eventually became the Child Citizenship Act provided that it would become effective simply "120 days after the date of enactment of this Act." See Child Citizenship Act of 2000, H.R. 2883, § 5, reprinted in H.R. Rep. No. 106-852 (2000). However, when the bill was taken up for consideration on the House floor, the second clause had been added. Obviously, Congress

23

must have intended that this clause have some effect.

Third, we note that Title II of the Child Citizenship Act is devoted to providing certain relief to aliens who voted in United States elections under the reasonable belief that they were American citizens. In contrast to § 104, the effective date provisions contained in Title II explicitly provide that the amendments related to voting apply to past conduct and shall be effective as if they had been enacted in 1996. Had Congress intended that the amendments to § 320 of the INA have the broad retroactive effect Nehme advocates, it would have used similar retroactive language in § 104.[19] Finally, while we acknowledge that the Court in Landgraf looked to legislative history to ascertain

---

[19]Moreover, following passage in the House, the sponsor of the bill, Congressman Delahunt, issued a press release describing the situation of a twenty-two year old Brazilian man named Joao Herbert. Herbert never naturalized and had been ordered deported because of his conviction for a drug offense. The press release explained:

> By granting automatic naturalization to minor children of US citizens, the Delahunt bill would prevent [the deportation of certain aliens] from occurring in the future. His original legislation would also have permitted children over 18–such as . . . Herbert–to avoid deportation by applying for naturalization under existing law. But while Delahunt was unable to win agreement to include this provision in the final bill, the final text does provide relief from deportation for one particular group of noncitizens who are deportable under the 1996 act: those who voted in U.S. elections in the reasonable (though mistaken) belief that they were citizens at the time.

Press Release, News from Congressman Bill Delahunt (Sept. 19, 2000). We think this demonstrates the understanding of the legislation's sponsor that the Child Citizenship Act offered no relief to aliens in situations such as Nehme's. We also find the following statement of Congressman Gejdenson illuminating:

> [T]here are tragic cases where children of U.S. parents, never naturalized because of inadvertence, are facing deportation because of a crime they have committed. While these children must face their punishment, to deport them to countries with which they have no contact, no ability to speak the language, and no family known to them is needlessly cruel. We must be sure that this never happens again.

146 Cong. Rec. H7778 (daily ed. Sept. 19, 2000) (statement of Cong. Gejdenson) (emphasis added).

24

Congress's intent, see 511 U.S. at 262, 114 S. Ct. at 1495, Nehme has pointed out no legislative history in the present case indicating that the Child Citizenship Act was intended to apply retroactively to aliens who met the amended requirements at any time in the past or future.[20]

We think Congress has explicitly stated its intent regarding the temporal effect of the derivative naturalization amendments. Although Nehme cites the Court's decision in Bradley v. School Board of Richmond, 416 U.S. 696, 94 S. Ct. 2006, 40 L. Ed. 2d 476 (1974) for the proposition that we should apply the law in effect at the time of our decision, we note that the Court formulated an exception to that rule when "there is statutory direction or legislative history to the contrary." Id. at 711, 94 S. Ct. at 2016.

Because we have concluded that Congress has explicitly prescribed the Child Citizenship Act's temporal reach, we need not proceed to the second step of the Landgraf analysis.[21]

---

[20]Additionally, while some of the new legislation's provisions may have a remedial effect, the Supreme Court has stated that "reliance on the vaguely remedial purpose of a statute to defeat the presumption against retroactivity was rejected" in Landgraf and related cases. Plaut v. Spendthrift Farm, Inc., 514 U.S. 211, 237, 115 S. Ct. 1447, 1462, 131 L. Ed. 2d 328 (1995).

[21]In a last-ditch effort to convince us to apply the Child Citizenship Act in his case, Nehme argues in his Supplemental Reply Brief that the INS's interpretation of § 104 would unconstitutionally distinguish between two classes of persons: aliens who become eighteen years old prior to § 104's effective date, and those who turn eighteen after that date. Those in the first class can be deported because of their criminal convictions, while those in the second class will never be subject to deportation. Nehme argues that this classification is irrational and violates the Equal Protection and Due Process Clauses. We are not persuaded. The Child Citizenship Act does nothing to render an alien deportable. It merely provides that minor children who meet certain conditions on its effective date may be automatically naturalized. Children who are over the age of eighteen on its effective date may still become American citizens, if they are not otherwise deportable, by applying for naturalization.

Moreover, "[t]he constraints of rationality imposed by the constitutional requirement of substantive due process and of nondiscrimination exacted by the equal protection component of the due process clause do not limit the federal government's power to regulate either immigration or naturalization." In re Longstaff, 716 F.2d 1439, 1442-43. (5ᵗʰ Cir. 1983). Indeed, as the Supreme Court has stated, "[i]n the exercise of its broad power over naturalization and immigration, Congress

25

III.

CONCLUSION

We conclude that the "legal separation" requirement in former 8 U.S.C. § 1432 complies with the constitutional mandate of uniformity and may be validly applied to Nehme. Nehme's parents were never legally separated as we interpret that term. Therefore, he did not qualify for derivative naturalization. Furthermore, the Child Citizenship Act of 2000 does not apply to Nehme. He is consequently an alien who is deportable because of his aggravated felony conviction, and we have no jurisdiction in this case under 8 U.S.C. § 1252(a)(2)(C). The petition for review is dismissed.

DISMISSED.

---

regularly makes rules that would be unacceptable if applied to citizens." Mathews v. Diaz, 426 U.S. 67, 79-80, 96 S. Ct. 1883, 1891, 48 L. Ed. 2d 478 (1976). However, even applying a rationality standard, we think Congress could have rationally determined to make the derivative naturalization provisions of the Child Citizenship Act applicable only to children not yet eighteen years old on its effective date. "Naturalization is a privilege, to be given, qualified, or withheld as Congress may determine, and which the alien may claim as of right only upon compliance with the terms which Congress imposes." United States v. Macintosh, 283 U.S. 605, 615, 51 S. Ct. 570, 572, 75 L. Ed. 1302 (1931), overruled on other grounds by Girouard v. U.S., 328 U.S. 61, 66 S. Ct. 826, 90 L. Ed. 1084 (1946). From time to time, Congress may decide to limit or expand the number of persons on which it bestows the privilege of automatic naturalization. There is nothing irrational about regulating the availability and process of naturalization based on the nation's changing immigration capacity, and the INS's ability to process the expanding number of naturalization applications through the ordinary course. See 146 Cong. Rec. H7777 (daily ed. Sept. 19, 2000) (statement of Cong. Delahunt) (noting that in extending automatic naturalization to alien children adopted by American citizens, the Child Citizenship Act will relieve the INS "of the need to spend its limited resources on some 16,000 naturalization cases for the past year alone, and that number is expected to increase.").