

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-11-2005

# Bagot v. Atty Gen

Precedential or Non-Precedential: Precedential

Docket No. 04-2127

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"Bagot v. Atty Gen" (2005). *2005 Decisions.* Paper 1508.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/1508

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 04-2127

———

ODIRI NKOFI BAGOT,

*Appellant*

v.

JOHN ASHCROFT;
JAMES ZIGLAR;
KENNETH ELWOOD

———

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 03-cv-00309)
District Judge: Honorable Yvette Kane

———

Argued: December 14, 2004
Before: NYGAARD, ROSENN, and BECKER, *Circuit Judges.*

(Filed February 11, 2005)

JAMES V. WADE
Federal Public Defender
RONALD A. KRAUSS (ARGUED)
Assistant Federal Public Defender
100 Chestnut Street, Suite 306
Harrisburg, PA 17101
*Attorneys for Appellant*

THOMAS A. MARINO

United States Attorney
DARYL F. BLOOM (ARGUED)
Assistant United States Attorney
United States Attorney's Office
Middle District of Pennsylvania
228 Walnut Street, Suite 220
Harrisburg, PA 17108
*Attorney for Appellees*

_____

OPINION OF THE COURT

_____

BECKER, *Circuit Judge*.

This appeal by Odiri Nkofi Bagot ("Bagot") from the District Court's order denying his petition for a writ of habeas corpus in a deportation case requires us to inquire into the matter of "legal custody." That inquiry will inform our determination as to whether Bagot is correct that Respondents deported him to Guyana illegally, because, having been in his father's legal custody at the time the father was naturalized, he is derivatively a United States citizen. Respondents maintain that, although Bagot lived with his father in New York, a previous New York state divorce decree and form custody order left him in the *legal* custody of his mother, who was in Guyana at the time and had never been to the United States.

The District Court was confronted, as we are here, with the difficult question of how to define "legal custody"—but the relevant law is almost silent on that definition. Judge Becker, the author of the Opinion of the Court, believes that, as there is "no federal law of domestic relations," *De Sylva v. Ballentine*, 351 U.S. 570, 580 (1956), legal custody depends on state law in the first instance. Having reviewed the New York precedents, he concludes that Bagot was not in his mother's legal custody under state law. Judges Rosenn and Nygaard would not delve into state law, but would find that no valid decree awarded custody of Bagot to his mother. The panel is unanimous, however, that under the fallback "actual uncontested custody" standard of the immigration laws, *see*

2

*Matter of M—*, 3 I. & N. Dec. 850 (BIA 1950), Bagot was in the legal custody of his father and thus obtained derivative citizenship. We will therefore reverse the order of the District Court and remand with directions to issue the writ.

The Opinion of the Court in this case consists of Parts I, II, III.A, III.B.2, IV, and V of this Opinion. In the remainder of Part III.B, and in Part III.C, Judge Becker, writing only for himself, explores New York's law of legal custody. Although, as will appear, he finds that law inconclusive, he believes that this threshold exercise is compelled both by the reasoning of our sister Courts of Appeals and by basic principles of federalism.

## I. Facts and Procedural History

### A. Background Facts

The essential facts are not in dispute. Petitioner Odiri Nkofi Bagot was born on March 6, 1974, in Guyana. His parents, Brian Bagot and Frances Wright, were natives and citizens of Guyana, and had married there in 1971. In 1982, Brian Bagot left his wife and three children in Guyana and emigrated to the United States, settling in Brooklyn, New York.

In 1984, Brian Bagot, acting pro se, sued Frances Wright for divorce in New York City. On August 28, 1984, Justice Jack Turret of the New York County Supreme Court granted the divorce in a two-page form order. The form contained a child custody provision, in which Frances Wright's name was typed. The custody provision read: "Frances Bagot shall have custody of the child(ren) of the marriage," and then listed the three children, including Odiri Bagot. The words "shall have custody of the child(ren) of the marriage" were pre-printed on the form; the names of Frances Bagot and the children were filled in. In addition, typed onto the form was the statement "That the Family Court shall be granted concurrent jurisdiction with the Supreme Court with respect to the issues of; support, custody and visitation." Frances Wright and all three Bagot children were still living in Guyana at that time; it does not appear that they had ever been in the United States at the time of the divorce.

Life in Guyana was apparently difficult for the children, and in 1988 Frances Wright and Brian Bagot agreed that the children

would be better off living in New York. Wright therefore agreed to give Brian Bagot custody of, and responsibility for, the children, and to send them to live with him in New York. Frances Wright herself remained in Guyana until October 1995. She then went to New York to live with one of her daughters, and became a naturalized U.S. citizen on February 26, 2001.

Brian Bagot, meanwhile, had made arrangements to bring his children to New York. Odiri Bagot arrived in New York on November 16, 1988, as a lawful permanent resident. He was fourteen years old. Odiri Bagot was raised by his father from that time on. He lived with his father in Brooklyn, and attended Erasmus High School there. On December 13, 1991, Brian Bagot became a naturalized United States citizen. At the time, Odiri Bagot was seventeen years old.

## B. The Removal Proceedings

On May 14, 1999, in the County Court for Broome County, New York, Odiri Bagot pled guilty to third-degree attempted criminal sale of a controlled substance (cocaine). *Cf.* N.Y. Penal Law § 220.39. He received a sentence of three to six years.

On January 24, 2000, while Odiri Bagot was in prison, the Immigration and Naturalization Service (INS) initiated removal proceedings.[1] The INS claimed that Bagot, as a non-citizen lawful permanent resident, was removable under § 237 of the Immigration and Nationality Act (INA) because he had been convicted of an aggravated felony and of a controlled-substance violation.[2] An Immigration Judge ordered Bagot removed to the Bahamas or

---

[1]The Department of Homeland Security has taken over the responsibilities of the former INS. *See Ambartsoumian v. Ashcroft*, 388 F.3d 85, app. at 95 n.6 (3d Cir. 2004). The Bureau of Immigration and Customs Enforcement, within the Department of Homeland Security, has assumed some of those functions.

[2]The INA classifies as deportable any alien who commits an aggravated felony, 8 U.S.C. § 1227(a)(2)(A)(iii), or who violates any law relating to controlled substances, 8 U.S.C. § 1227(a)(2)(B)(i). Illicit trafficking in a controlled substance qualifies as an aggravated felony. 8 U.S.C. § 1101(a)(43)(B).

Guyana. Appeal to the Board of Immigration Appeals (BIA) was waived. Bagot was paroled from the New York prison system on November 19, 2002, and was taken into Bureau of Immigration and Customs Enforcement (BICE) custody.

On February 19, 2003, Bagot filed the present petition for habeas corpus in the United States District Court for the Middle District of Pennsylvania, which entered a temporary stay of deportation. Two days after filing his petition, Bagot filed an application for a Certificate of Citizenship, claiming that he was entitled to derivative citizenship based on his father's naturalization. The INS denied this application on February 26, 2003. The Administrative Appeals Unit denied an appeal. On February 25, 2004, the District Court denied the petition for habeas corpus. Bagot filed a timely notice of appeal on April 23, 2004.

In its February 2004 decision, the District Court lifted its stay of deportation. Prior to briefing in this appeal, Bagot was apparently removed to Guyana.

## II. Jurisdiction and Standard of Review

The District Court had jurisdiction in this habeas action pursuant to 28 U.S.C. § 2241. We have appellate jurisdiction to review the District Court's denial of habeas corpus under 28 U.S.C. §§ 1291 and 2253. *See Gerbier v. Holmes*, 280 F.3d 297, 302 (3d Cir. 2002). Although Bagot has been removed to Guyana, the removal does not moot his appeal. *See Chong v. Quarantillo*, 264 F.3d 378, 385 (3d Cir. 2001). As the facts are not disputed, we review only the legal question whether Bagot was in the "legal custody" of his father at the time when his father became a naturalized U.S. citizen. This is a question of law subject to plenary review. *See Gerbier*, 280 F.3d at 302.

Several of the arguments that Bagot now presses were not raised, in specific terms, before the District Court. In particular, much turns on Bagot's contention that the custody award in the 1984 New York divorce judgment was invalid under New York law, a contention that was raised for the first time on appeal. Respondents claim that this argument is waived, and urge us not to consider it now, pointing out that "[i]t is well established that failure to raise an issue in the district court constitutes a waiver of the argument" in this Court. *Brenner v. Local 514, United Bhd. of*

5

*Carpenters & Joiners of Am.*, 927 F.2d 1283, 1298 (3d Cir. 1991).

At oral argument, Bagot's counsel asserted that certain other arguments in the briefing before the District Court, especially the contention that Bagot's father never lost his parental rights, implicated the question whether the divorce judgment was valid and therefore put that question fairly before the District Court. We are skeptical. "[T]he crucial question regarding waiver is whether [petitioner] presented the argument with sufficient specificity to alert the district court," *Brennan v. Norton*, 350 F.3d 399, 418 (3d Cir. 2003) (quoting *Keenan v. City of Philadelphia*, 983 F.2d 459, 471 (3d Cir. 1993)), and it is questionable whether Bagot's general statement that his father retained custody was enough to inform the District Court of his present argument that the 1984 New York divorce judgment was entered without subject-matter jurisdiction.

However, this conclusion need not be fatal to Bagot's appeal. This Court has discretionary power to address issues that have been waived. *See Keenan*, 983 F.2d at 471; *id.* at 477 (Higginbotham, J., dissenting in part); *Loretangeli v. Critelli*, 853 F.2d 186, 189-90 n.5 (3d Cir. 1988) ("This court may consider a pure question of law even if not raised below where refusal to reach the issue would result in a miscarriage of justice or where the issue's resolution is of public importance."); *Selected Risks Ins. Co. v. Bruno*, 718 F.2d 67, 69 (3d Cir. 1983) ("[I]n the past we have heard issues not raised in the district court when prompted by exceptional circumstances." (citations omitted)).

We think that this is just such an exceptional case, and that it is therefore appropriate to consider Bagot's waived arguments on appeal. The argument omitted in the District Court is a pure question of law, and one that is closely related to arguments that Bagot did raise in that court. No additional fact-finding is necessary. As will appear, the proper resolution of the legal question, though not exactly simple, is reasonably certain. And failing to consider Bagot's arguments would result in the substantial injustice of deporting an American citizen.

### III. Legal Standards

Bagot does not dispute that he has committed a removable offense under 8 U.S.C. §§ 1227(a)(2)(A)(iii) and 1227(a)(2)(B)(i). He argues only that he is in fact an American citizen, and therefore

not subject to deportation under 8 U.S.C. § 1227. *See Acosta v. Gaffney*, 558 F.2d 1153, 1158 (3d Cir. 1977). This argument is based on the provisions of the INA that allow children of citizens, in some circumstances, to claim derivative citizenship.

## A. Derivative Citizenship

Bagot was not born in the United States and has never been formally naturalized; his citizenship claim is derivative upon his father's naturalization. The burden of proof of eligibility for citizenship is on the applicant. *Berenyi v. District Director, INS*, 385 U.S. 630, 637 (1967). All doubts "should be resolved in favor of the United States and against the claimant." *Id*. (quoting *United States v. Macintosh*, 283 U.S. 605, 626 (1931)).

At the times relevant to this case, the INA's requirements for derivative citizenship were as follows:

> (a) A child born outside of the United States of alien parents . . . becomes a citizen of the United States upon the fulfillment of the following conditions:
> > (1) The naturalization of both parents; or
> > (2) The naturalization of the surviving parents if one of the parents is deceased; or
> > (3) *The naturalization of the parent having legal custody of the child when there has been a legal separation of the parents* or the naturalization of the mother if the child was born out of wedlock and the paternity of the child has not been established by legitimation; and if
> > (4) Such naturalization takes place while such child is under the age of eighteen years; and
> > (5) Such child is residing in the United States pursuant to a lawful admission for permanent residence at the time of the naturalization of . . . the parent naturalized under clause (2) or (3) of

7

> this subsection, or thereafter begins to reside permanently in the United States while under the age of eighteen years.

8 U.S.C. § 1432(a) (1999) (emphasis added), *repealed by* Child Citizenship Act of 2000 ("CCA"), § 103, Pub. L. No. 106-395, 114 Stat. 1631.[3] Thus Bagot must prove four essential facts: (1) that his father was naturalized after a legal separation from his mother; (2) that his father was naturalized before he (Odiri Bagot) turned eighteen; (3) that he was residing in the United States as a permanent legal resident at the time of his father's naturalization; and (4) that his father had legal custody at the time of his (Brian Bagot's) naturalization. Respondents concede the first three facts. This case therefore turns on whether Brian Bagot had legal custody of Odiri Bagot in December 1991, when he was naturalized.

---

[3]The current provision relevant to children born abroad to later-naturalized parents is 8 U.S.C. § 1431(a), which provides that:

> (a) A child born outside of the United States automatically becomes a citizen of the United States when all of the following conditions have been fulfilled:
> (1) At least one parent of the child is a citizen of the United States, whether by birth or naturalization.
> (2) The child is under the age of eighteen years.
> (3) The child is residing in the United States in the legal and physical custody of the citizen parent pursuant to a lawful admission for permanent residence.

Former § 1432(a), however, controls this case. The CCA went into effect on February 27, 2001, 120 days after it was signed. *See* CCA § 104. At all relevant times—Bagot's birth, his move to the New York, his father's naturalization, and his eighteenth birthday—former § 1432(a) was in effect. *Cf. Runnett v. Shultz*, 901 F.2d 782, 783 (9th Cir. 1990) ("The applicable law for transmitting citizenship to a child born abroad when one parent is a U.S. citizen is the statute that was in effect at the time of the child's birth.").

## B. Legal Custody Under the INA[4]

The natural starting point for defining legal custody as used in § 1432(a) is the INA itself, as "[w]hat is meant by the phrase 'having legal custody of the child' is, of course, a question of federal statutory interpretation." *Fierro v. Reno*, 217 F.3d 1, 3-4 (1st Cir. 2000). But the INA does not define the term "legal custody," and its legislative history is similarly unhelpful on the question. *See id.* at 4.

There exist two partially competing paradigms of INA legal custody. The first is that adopted by several other Courts of Appeals, which have looked to state law to decide who has legal custody of a minor for derivative citizenship purposes. The second is that employed by the BIA, which involves a more-or-less unitary national standard for determining who has such legal custody.

### 1. The State-Law Paradigm

The leading Court of Appeals case discussing legal custody for § 1432(a) purposes is *Fierro v. Reno*, *supra*. The First Circuit, after recognizing that the issue is one of federal law, nonetheless looked to state law to determine who had legal custody:

> Legal relationships between parents and children are typically governed by state law, there being "no federal law of domestic relations." Accordingly, subject to possible limitations, we think that the requirement of "legal custody" in section 1432 should be taken presumptively to mean legal custody under the law of the state in question. . . . [T]his view is consistent with the approach taken in other cases in which a federal statute depends upon relations that are primarily governed by state law.

217 F.3d at 4 (citations omitted) (quoting *De Sylva v. Ballentine*, 351 U.S. 570, 580 (1956)). Other courts have found this analysis

---

[4]Judges Rosenn and Nygaard do not join Parts III.B (except Part III.B.2) or III.C of this Opinion, which represent only the view of Judge Becker.

persuasive. *See Tabucbuc v. Ashcroft*, 84 Fed. Appx. 966, 969 (9th Cir. Jan. 2, 2004) (unpublished opinion) ("To determine whether [petitioner] was in the legal custody of his father when he immigrated to the United States in 1984, we look presumptively to Hawai'i law." (citing *Fierro*)); *Bucknor v. Zemski*, No. 01-3757, 2002 WL 221540, *4 (E.D. Pa. Feb. 12, 2002) ("This Court agrees [with *Fierro*], and to determine whether [petitioner's] father had legal custody over [him], this Court will apply Pennsylvania state law."); *cf. In re Bulfa-Dadulo*, No. A44 273 047, 2004 WL 1059577 (BIA Mar. 16, 2004) (unpublished decision) (citing *Fierro* approvingly, and looking to state law to determine whether parents were "legally separated").

The Seventh Circuit has come to the same conclusion independently, noting that the INS has regularly referred to state law in deciding legal custody. *Wedderburn v. INS*, 215 F.3d 795, 799 (7th Cir. 2000) ("'Legal custody' and 'legal separation of the parents,' as words in a federal statute, must take their meaning from federal law. . . . But federal law may point to state (or foreign) law as a rule of decision, and this is how the INS has consistently understood these terms.").

On the other hand, the Fifth Circuit has declined to defer to state law in defining the analogous term "legal separation" for § 1432(a)(3) purposes. In *Nehme v. INS*, 252 F.3d 415, 422 (5th Cir. 2001), that court held that "in the absence of plain language to the contrary, Congress does not make the application of a federal act dependent on state law." *Nehme* cited *Fierro* and *Wedderburn* approvingly for the proposition that the definition of "legal separation" is an issue of federal law, but refused to follow their lead in looking to state law to help decide the issue. Finding that the linchpin of the analysis was the need for uniformity across the nation, the Fifth Circuit determined that the question of legal separation was one of federal law, and "reject[ed] any contention that the law of any one state should govern the determination whether an alien child's parents were 'legally separated.'" *Id*. at 423-24.

The Fifth Circuit therefore arrived at a unitary definition of legal separation. In so doing, it looked to the laws of several states, and to the legislative history of the INA, which "indicates that Congress wanted to ensure that only alien children whose 'real interests' were located in America with their custodial parent, and

10

not abroad, should be automatically naturalized." 252 F.3d at 425. The court therefore concluded that legal separation requires a judicial act to create separation: mere living apart, without a formal separation, does not qualify as legal separation under the INA. *See id.* at 425-26; *see also Brissett v. Ashcroft*, 363 F.3d 130, 133-34 (2d Cir. 2004) (approving the INS interpretation, following *Nehme*, that "an informal separation is not sufficient to render the parties legally separated" under § 1432(a)(3)).

Because *Nehme* is concerned with the concept of legal separation, not legal custody, it is of limited relevance to this case. The policy goal that the Fifth Circuit drew from the INA's legislative history—ensuring that the child's "real interests" were with the custodial parent in the United States—is unlikely to be hindered by applying state law definitions of child *custody*, as those standards typically make reference to the child's interests. And, because there is "no federal law of domestic relations," *DeSylva*, 351 U.S. at 580, I think that it is most appropriate to turn, in the first instance, to state-law definitions of legal custody. I therefore would not extend *Nehme* to this case; instead, I agree with *Fierro* and *Wedderburn* that it is appropriate to look to state law to define "legal custody" for the purposes of 8 U.S.C. § 1432(a)(3).

## 2. The BIA Paradigm

The BIA, however, has made its own attempts at defining "legal custody" under the INA. The BIA's longstanding interpretation of the "legal custody" requirement is set out in *Matter of M—*, 3 I. & N. Dec. 850 (BIA 1950). In that case, the BIA interpreted a predecessor statute of § 1432(a)(3), and stated:

> It is the view of the [Immigration and Naturalization] Service that, in the absence of judicial determination or judicial or statutory grant of custody in the case of legal separation of the parent [sic] of a person claiming citizenship under section 314(c), the parent having actual uncontested custody is to be regarded as having "legal custody" of the person concerned for the purpose of determining that person's status under section 314(c).

3 I. & N. Dec. at 856. Thus, *Matter of M—* provides a two-step test

11

of legal custody. First, if there is a "judicial determination or judicial or statutory grant of custody," then the parent to whom custody has been granted has legal custody for INA purposes. Second, if no such determination or grant exists, then the parent in "actual uncontested custody" is deemed to have legal custody.

The *Matter of M—* test has been cited approvingly by the Seventh Circuit in *Wedderburn*, *supra*, 215 F.3d at 797 (citing *Matter of M—* for the proposition that "one parent's permanent physical custody with the other's consent is 'legal custody'"), by a recent unpublished BIA decision, *In re Kwe*, No. A37 385 667, 2003 WL 23508701 (BIA Dec. 17, 2003) (unpublished decision) ("In the absence of a judicial determination or judicial or statutory grant of custody in a case of a legal separation of the naturalized parent, the parent having actual, uncontested custody is to be regarded as having 'legal custody' of the child."), and by a District Court in this Circuit, *Charles v. Reno*, 117 F. Supp. 2d 412, 417 (D.N.J. 2000). *See also* Am. Jur. 2d Aliens & Citizens § 2883 (2004) ("'Legal custody' of the child, for purposes of the statute, resides in the parent who has been granted custody of the child by court order or statutory grant, or, in the absence thereof, in the parent having actual uncontested custody of the child." (footnotes omitted) (citing *Matter of M—*)).

*Matter of M—* appears to represent the position of the agencies charged with interpreting the INA. Respondents thus argue that we are bound to give it deference under *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). This proposition is subject to some debate. *See Hughes v. Ashcroft*, 255 F.3d 752, 757-758 (9th Cir. 2001) (finding *Chevron* deference to the INS inappropriate in determining United States citizenship, because the INA leaves that determination in the hands of the courts). It is not necessary to decide, however, whether the *Matter of M—* standard is entitled to *Chevron* deference, both because it is helpful in understanding the meaning of "legal custody," and because the parties appear to accept its application here.

### 3. A Framework for INA Legal Custody: Reconciling *Fierro* and *Matter of M—*

This leaves a surfeit of standards, as both the *Fierro* approach (looking to state law to define legal custody) and the

*Matter of M—* test (looking for a decree of custody or, failing that, for "actual uncontested custody") are helpful. I conclude, however, that these two standards can be reconciled in a straightforward way.[5]

The BIA position in *Matter of M—* is that a "judicial determination or judicial or statutory grant of custody" creates legal custody. These are all matters of state law, as no federal courts or statutes grant child custody. Thus, the first stage of the *Matter of M—* determination is a matter of state law, consistent with *Fierro*. If state law provides no answer as to child custody, then federal courts cannot follow *Fierro* to determine who has legal custody.[6] Rather than simply inventing state law, however, the courts can fall back on the second part of the *Matter of M—* test: if state law does not fix "legal custody," then the federal standard of "actual uncontested custody" applies.

Thus, if, for example, a state court has entered a valid decree granting custody of a child to the child's father, then the father has "legal custody" of the child. This result follows naturally from both *Fierro* and *Matter of M—* (as it is a "judicial determination or judicial . . . grant of custody"). Similarly, if (again, for example) there has been no decree, but a state statute provides that "in the absence of a decree, a child of divorced parents is in the legal

_____

[5]Judge Rosenn, in his concurrence joined by Judge Nygaard, concludes that *Matter of M—* is dispositive in this case, and therefore would not delve into state law. I think that *Fierro* correctly held that we must look to state law, in the first instance, to decide matters of legal custody, as there is no federal law of domestic relations. I view this as an important principle of federalism. *Fierro* may be factually distinguishable—there, unlike here, there was a valid state-court decree—but I think it clear that the underlying principle of *Fierro* requires an inquiry into state law.

[6]One could read *Fierro*'s reliance on state law to indicate that, where state law does not fix custody, neither parent has legal custody for § 1432(a)(3) purposes, and the child cannot claim derivative citizenship through either parent. But this reading comports with neither the intent of *Fierro* nor the purposes of the INA, which attempts to find the parent with whom the child's interest lies. Therefore, I do not take *Fierro* to mean that, where state law is silent, no parent has legal custody under the INA, and I would instead follow *Matter of M—* in such a situation.

custody of whichever parent he resides with," then courts should follow the state law under both *Fierro* and *Matter of M—* ("statutory grant of custody"). And, if state law is silent about legal custody, *Fierro* is of no help, and we must rely on the *Matter of M—* fallback of "actual uncontested custody."[7]

In this case, then, I look first at the New York law defining legal custody. Only because that law does not determine who had legal custody of Odiri Bagot do I turn to the *Matter of M—* standard of actual uncontested custody.

## C. Legal Custody Under New York Law

I believe that our first obligation under *Fierro* is to examine New York law to see whether it clearly determines legal custody. Unfortunately, New York law, like the INA, does not define the term "legal custody." The New York Domestic Relations Law uses the term repeatedly, but never defines it. Nor does any case from the Court of Appeals, New York's highest court, define or explicate the phrase. I have found only three cases in which New York courts have given some clues to the state's definition of "legal custody," albeit not clear direction. *See Otero ex rel. Otero*

---

[7]This reconciliation of *Matter of M—* and *Fierro* is not seamless. One can imagine, for example, a state in which there is no statutory definition of legal custody, but whose common law has consistently held that a child of divorced parents is always in the legal custody of his mother. In this state, a child of divorced parents as to whom there has been no custody decree would be, as a matter of state law, in the custody of his mother, even if he in fact lived with his father. *Fierro* leads to the conclusion that such a child would be in the custody of his mother. On the other hand, under *Matter of M—*, since his status was not determined by a "judicial determination or judicial or statutory grant of custody" (unless the common-law rule can be treated as a "judicial grant of custody"), this child would be in the custody of whoever has "actual uncontested custody"—in that case, presumably, his father.

This is probably a far-fetched example. In most normal cases, either state law will determine custody by statute or judicial determination, or else state law will be silent and the court will be left to fall back on "actual uncontested custody." It may be that some theoretical tension remains between *Fierro* and *Matter of M—*, but that tension is unlikely to assert itself often.

*v. State*, 602 N.Y.S.2d 501 (N.Y. Ct. Cl. 1993); *Villafane v. Banner*, 387 N.Y.S.2d 183 (N.Y. Sup. Ct. 1976)); *Coveleski v. Coveleski*, 93 A.D.2d 924 (N.Y. App. Div. 1983). The first two cases were decided in the context of New York Civil Practice Law and Rules (CPLR) 1201, which allows a parent or other person with "legal custody" to bring a suit on behalf of an infant. The *Otero* and *Villafane* courts determined legal custody only for the purpose of allowing the alleged custodian to sue on the child's behalf.

In *Otero*, the New York Court of Claims, which adjudicates civil suits against state government agencies, refused to allow an incarcerated father to bring a CPLR 1201 suit on behalf of his infant daughter, who was injured while visiting him in prison. The court noted that there was "very little discussion of the term 'legal custody' as used in this context. It apparently incorporates both physical custody and, where someone other than a parent has physical custody, a judicial decree awarding custody to that person." 602 N.Y.S.2d at 502 (citing *Villafane*, *supra*, 387 N.Y.S.2d at 184). Finding that an incarcerated parent could not have physical custody, the court ordered the case dismissed unless the daughter's legal custodian was substituted as plaintiff within sixty days. *Id*.

In *Villafane*, the Supreme Court of New York County refused to allow a grandmother to bring a CPLR 1201 action on behalf of her infant grandchild. The grandmother had long had "informal custody" of the infant, but the child had never formally been placed in her care. The court determined that, under CPLR 1201, married parents share legal custody, while, if the parents are separated, "[i]t would appear . . . that 'having legal custody' was intended to designate a person whose custody was formally determined by judicial decree." 387 N.Y.S.2d at 184. As no such decree gave the grandmother custody, the court stayed the suit pending appointment of a guardian ad litem to litigate on behalf of the infant.

The CPLR 1201 context is tangential here, and I am none too confident in drawing lessons about New York's law of legal custody from these two cases. I do so only because there are so few relevant sources for that law, and because *Otero* and *Villafane*, like the INA, seem motivated by a desire to fix legal custody on the person who represents the real interests of the child, in order to

insure that litigation on behalf of the child is actually in his or her interests.[8]

On the other hand, the third New York case, *Coveleski*, *supra*, 93 A.D.2d 924, is more clearly a domestic relations case. Pursuant to a separation agreement, an earlier court order had granted custody of a child to the mother, and required the father to pay child support. The father ended up having physical custody of the child for a significant period, and did not pay child support during that time. The mother sued for the arrearages, and the father "argue[d] that he had physical custody of the child during the period in question and not plaintiff and, therefore, he was not required to pay plaintiff child support pursuant to the agreement." *Id*. at 924. The Appellate Division disagreed, noting that the separation agreement and judgment of divorce had never been modified, and "consequently *legal custody* of the child continued throughout in plaintiff." *Id*. (emphasis added).

*Coveleski* is clearly in some tension with *Otero*'s suggestion that physical custody is a necessary element of legal custody. Given this tension, I think it best to avoid determining whether New York legal custody law actually requires physical custody, as Bagot urges us to do.

On the other hand, each of these New York cases places some emphasis on deriving legal custody from a judicial decree. While *Otero* at least suggests that a *parent* in physical custody may not need a decree to obtain legal custody, *Villafane* and *Coveleski* seem to require a judicial decree of custody in essentially all cases.

---

[8]I note also that no court seems to have questioned these cases' definitions of legal custody. *Villafane*'s method of defining custody has been cited approvingly by another New York Supreme Court case, *Matter of Meyers*, 528 N.Y.S.2d 778, 779 (N.Y. Sup. Ct. 1988) (finding that an infant's mother cannot sue on his behalf where his grandmother has been granted custody by legal decree), and *Otero*'s method has been cited by two federal district courts in New York, *Bailey v. Tricolla*, No. CV-94-4597 (CPS), 1995 WL 548714, *7 (E.D.N.Y. Sep. 12, 1995) (finding physical custody to be a necessary element of legal custody); *DeBruyne v. Clay*, No. 94 Civ. 4704 (JSM), 1995 WL 51134, *2 (S.D.N.Y. Feb. 8, 1995) (same); *see also Ellis v. Hamilton*, 669 F.2d 510, 514 (7th Cir. 1982) (citing *Villafane* for the proposition that custodial grandparents might have the right to sue on behalf of their grandchildren).

16

I thus draw only the most limited conclusions from New York law. Taken together *Otero*, *Villafane*, and *Coveleski* make clear that, at a minimum, a valid judicial decree *plus* physical custody will create legal custody under New York law. Under *Coveleski*, it is quite likely that a valid judicial decree alone will create legal custody in at least some cases, though we need not decide that issue here. However, in the absence of a valid judicial decree of legal custody, matters are much murkier. No New York case appears to find legal custody in a divorced parent who does not have a custody order from a court.

It is not necessary to decide that New York law *requires* a valid judicial decree to create legal custody. Rather, I conclude only that New York law is not sufficiently clear to fix INA legal custody in the absence of such a decree. Therefore, under *Fierro*, I look to New York law to see if any court has issued a valid order determining legal custody. In the absence of such an order, and there is none here, I will not attempt to divine what New York courts would do; rather, I will fall back on the "actual uncontested custody" prong of *Matter of M—*.[9]

## IV. Legal Custody of Bagot in 1991

We now apply the law to the facts of Bagot's case. We first examine the 1984 divorce judgment that purportedly granted custody of Bagot to his mother. Finding that this decree did not create legal custody, we address the *Matter of M—* standard of "actual uncontested custody."

### A. New York Legal Custody

The 1984 judgment, on its face, granted a divorce between Brian Bagot and Frances Wright, and granted custody of the

---

[9]Thus I essentially adopt the entire test of *Matter of M—* in this case, requiring a judicial decree or, failing that, actual uncontested custody. However, under the *Fierro/Matter of M—* test set forth above, *see supra* Part III.B.3, this is not an inevitability; another state's law might more clearly fix custody even in the absence of a decree, and under *Fierro* I would look to that law in preference to the "actual uncontested custody" fallback.

children of their marriage to Frances Wright. Bagot argues that this grant of custody was invalid, because the New York court lacked jurisdiction to decide his custody.

## 1. The Validity of the Decree

There is no question that the New York County Supreme Court had jurisdiction to enter a judgment of divorce between Brian Bagot and Frances Wright. In New York, the Supreme Court can obtain *in rem* jurisdiction over a marriage if (among other possibilities) either party to the marriage has resided in New York for two years. N.Y. Dom. Rel. Law § 230(5) (2004). But the New York courts have jurisdiction over child custody determinations only if they can meet the higher standards of the Uniform Child Custody Jurisdiction Act (UCCJA), N.Y. Dom. Rel. Law § 75-d(1) (1999), which we set forth in the margin (and rely upon *infra*).[10]

---

[10]New York's version of the UCCJA provided:

1. A court of this state which is competent to decide child custody matters has jurisdiction to make a child custody determination by initial or modification decree only when:
(a) this state (i) is the home state of the child at the time of commencement of the custody proceeding, or (ii) had been the child's home state within six months before commencement of such proceeding and the child is absent from this state because of his removal or retention by a person claiming his custody or for other reasons, and a parent or person acting as parent continues to live in this state; or
(b) it is in the best interest of the child that a court of this state assume jurisdiction because (i) the child and his parents, or the child and at least one contestant, have a significant connection with this state, and (ii) there is within the jurisdiction of the court substantial evidence concerning the child's present or future care, protection, training, and personal relationships; or
(c) the child is physically present in this state and (i) the child has been abandoned or (ii) it is necessary in an emergency to protect the child; or

The mere fact of divorce jurisdiction does not create child-custody jurisdiction; the requisites for the two types of jurisdiction are different and must be separately satisfied. *See, e.g.*, *Foley v. Foley*, 649 N.Y.S.2d 999 (N.Y. Sup. Ct. 1996); *see generally* Merril Sobie, Practice Commentary to N.Y. Dom. Rel. Law § 76, section 2 (2002).

At the time of his parents' divorce, Bagot had never set foot in New York, so paragraph (a) of § 75-d(1), which applies where New York is the child's "home state," could not have created jurisdiction. Paragraph (b), which requires a "significant connection" with New York and "substantial evidence" within the state, was similarly inapplicable, again because there is no contention that Bagot had ever been to New York to establish such a connection. "Maximum rather than minimum contacts are required," *Vanneck v. Vanneck*, 404 N.E.2d 1278, 1282 (N.Y. 1980), and the legislative intent behind paragraph (b) was "to limit jurisdiction rather than to proliferate it," *id*. Paragraph (c), which creates emergency jurisdiction where the child is physically present in New York, was inapplicable because Bagot was not in the state at the time of the disputed custody grant.

This leaves us with paragraph (d), a fallback provision allowing New York to take jurisdiction where no other state has done so and such an exercise of jurisdiction is in the best interests

---

(d)(i) it appears that no other state would have jurisdiction under prerequisites substantially in accordance with paragraph (a), (b), or (c), or another state has declined to exercise jurisdiction on the ground that this state is the more appropriate forum to determine the custody of the child, and (ii) it is in the best interest of the child that this court assume jurisdiction.

N.Y. Dom Rel. Law § 75-d(1) (1999), *repealed by* 2001 N.Y. Laws c. 386. The 2001 legislation, which took effect on April 28, 2002, enacted the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA). The jurisdictional provision replacing § 75-d is at N.Y. Dom. Rel. Law § 76 (2004). The earlier UCCJA was effective from 1978 until 2002, *see* 1977 N.Y. Laws c. 493, § 2, and was thus New York law at all times relevant to this appeal.

19

of the child.[11] However, we doubt that a New York court would have assumed jurisdiction over a child who had never set foot in the state, and who lived with his mother in Guyana, on the basis of § 75-d(1)(d). *Cf.* Sobie, Practice Commentary to N.Y. Dom. Rel. § 75-d, section 4 (1988) ("The possibility of using the [§ 75-d(1)(d)] provision is fairly remote; examples might include migrant workers, hobos or perhaps members of a circus troop."). As long as it was not manifestly against Bagot's best interests to leave Guyana in control of his custody, a New York court would not have taken jurisdiction over his custody under paragraph (d). *See Nesa v. Baten*, 290 A.D.2d 663, 664 (N.Y. App. Div. 2002) ("[I]t is difficult to see how the [Bangladeshi] children's best interests would be served by having a New York court litigate issues of custody.").

Even if there was some conceivable way that the New York court could have taken jurisdiction under paragraph (d), such jurisdiction would require findings that it was in the best interests of the child. *See People ex rel. Bruzzesse v. Bruzzese*, 70 A.D.2d 957, 958 (N.Y. App. Div. 1979). The two-page form order lacks such findings, and provides no reason to believe that the New York court believed that it had § 75-d(d) jurisdiction over the child custody determination.

Thus there is no real doubt that the New York County Supreme Court lacked jurisdiction to determine Bagot's custody. The divorce decree appears to have been simply a form order, normally used for in-state divorce cases where custody over the children is easily established; the presiding justice presumably did not notice that he was exceeding his jurisdiction, and no one pointed out this error at the time.[12]

---

[11]The definition of "state" in the UCCJA did not include foreign countries, *see* N.Y. Dom. Rel. Law § 75-c(10) (1999) (repealed), so, as required by paragraph (d), no "state" had jurisdiction over Bagot; however, the UCCJA was intended to follow general principles of comity in respecting foreign jurisdiction. *See* N.Y. Dom. Rel. Law § 75-w (1999) (repealed).

[12]The failure to alert the New York court to its lack of jurisdiction did not waive the issue, as custody jurisdiction under § 75-d was not waiveable. *Gomez v. Gomez*, 86 A.D.2d 594, 595 (N.Y. App. Div.),

20

## 2. The Appropriateness of Reviewing State Judgments in Immigration Proceedings

Respondents contend, however, that this Court should refuse to examine the validity of the New York custody decree now, almost twenty years after that decree was issued. They argue forcefully that the INS's successor agency should be able to rely on the finality of state custody orders, and that, if immigration petitioners were allowed to mount collateral attacks on such orders, the result would be a heavy burden on the courts and the INS's successor agency. Courts might, the argument continues, have to look into whether there was proper service of the custody order, whether there was personal jurisdiction over the parties, and whether the custody decision was proper on its merits. Such inquiries would be costly and time-consuming, and might be susceptible to fraud and manipulation.

We share Respondents' concern for the finality of state-court judgments in immigration proceedings, and we confine our review of the New York court's custody order to the purely legal question whether, on the *undisputed facts* presented by this case, that court had *subject-matter jurisdiction* to issue a custody decree.[13] Such a narrow review does not implicate the concerns raised by the Respondents: we need not look into service of process, personal jurisdiction, or the merits of the custody determination; nor must we engage in any fact-finding that could be undermined by a petitioner's fraud. In this case, however, the predicate facts—that the divorce decree granted custody of Bagot, who had never been in the United States, to his mother—are undisputed, and they lead inevitably to the legal conclusion that the New York Supreme Court lacked subject matter jurisdiction over the custody determination under § 75-d. We feel confident that we can reach this conclusion without entering the thicket that

_____

*aff'd*, 437 N.E.2d 272 (N.Y. 1982).

[13]Although it speaks in terms of the location of the parties, N.Y. Dom. Rel. Law § 75-d creates subject-matter, not personal, jurisdiction. *See Gomez, supra* note 10, 86 A.D.2d at 595; *Bruzzese, supra*, 70 A.D.2d at 958; *Schaeffer v. Schaeffer*, 101 Misc. 2d 118, 120 (N.Y. Fam. Ct. 1979).

21

Respondents conjure.

Basic principles of conflict of laws, including New York's jurisprudence in the area, support our refusal to recognize custody decrees not properly based on subject matter jurisdiction. Under New York law, and the UCCJA as adopted by most states,[14] one state need not recognize the custody decree of another state "where the decree was not made under factual circumstances meeting the jurisdictional standards of the [UCCJA]." N.Y. Jur. Domestic Relations § 457 & n.21 (citing *Wilber v. Buelow*, 136 A.D.2d 786 (N.Y. App. Div. 1988) (refusing to give full faith and credit to Texas custody decree where Texas court lacked UCCJA jurisdiction)). No state following the UCCJA—including New York—would enforce the custody decree at issue here; we do not believe that a federal court should be bound by a decree that no state would consider binding.

Respondents correctly note that federal courts in immigration cases disfavor collateral attacks on the state convictions that give rise to aggravated-felony removals. *See, e.g.*, *Drakes v. INS*, 330 F.3d 600 (3d Cir. 2003); *Giammario v. Hurney*, 311 F.2d 285, 287 (3d Cir. 1962). But a collateral attack on the merits of a criminal conviction is much more susceptible to the problems posited by the Respondents than is an attack on a custody decree's subject-matter jurisdiction.

Child custody is a much more fluid affair than is an aggravated felony conviction. Indeed, few things in the law are as ephemeral as a child custody adjudication. To be sure, a state court's judgment of conviction renders an immigrant a removable aggravated felon; in the normal case, that status is unlikely to change. *But see* 8 U.S.C. § 1227(a)(2)(A)(v) (authorizing waiver of deportation for certain felons granted a full pardon by the President or a Governor). But a court's order granting child custody is rarely the final word on the subject; family circumstances constantly change, and family courts throughout the land frequently modify orders for full or partial custody (visititation) to better

_____

[14]The UCCJA continues in force in sixteen states and the U.S. Virgin Islands. Thirty-four other states, and the District of Columbia, had enacted the UCCJA, but have repealed it and adopted the UCCJEA. *See generally* Unif. Child Custody Jurisdiction Act Refs. & Annos., 9 U.L.A. 261-62 & supp. 25-27 (1999 & Supp. 2004).

accommodate the (changing) best interests of the child. *See* 45 N.Y. Jur. 2d Domestic Relations § 501.

Indeed, at oral argument in this case, Respondents conceded that Brian Bagot could have arranged to have the 1984 custody order modified to comport with the reality that he had undisputed physical custody over Odiri Bagot. Our deference to the finality of state criminal convictions is due in part to the fact that they are *intended* to be final; such deference to the finality of frequently and easily modified state custody determinations would, we think, be misplaced.

We therefore cannot find that Frances Wright had legal custody of Odiri Bagot under New York law. The decree that granted her custody was facially invalid, and no court in New York or anywhere else would defer to it.

## B. Actual Uncontested Custody

If no one had legal custody of Bagot under a New York decree, then were are left to the fallback "actual uncontested custody" prong of *Matter of M—* . That decision makes clear that, where legal custody has not been determined by decree or statute, "the parent having actual uncontested custody is to be regarded as having 'legal custody' of the person concerned for the purpose of determining that person's status under [§ 1432(a)]." 3 I. & N. Dec. at 856. *See* Part III.B.2, *supra*. Therefore, if New York law did not fix Bagot's legal custody, his father had "legal custody" of him for derivative-citizenship purposes if, but only if, he had "actual uncontested custody."

We think it is clear that he did. Brian Bagot had actual physical custody of Odiri Bagot, who lived with him and attended high school in Brooklyn; Frances Wright approved of the arrangement; and no one else seems to have disputed his father's custody of Bagot at any time. In *Matter of M—*, a father who took care of his daughter was found to have "legal custody," based on his "actual uncontested custody," where he lived with the child and undertook to provide for her, and where the mother consented to his custody. 3 I. & N. Dec. at 851, 856. Similarly, in *Charles*, *supra*, 117 F. Supp. 2d at 418, the court found "actual, uncontested custody" where the father had been responsible for the child's upbringing and the mother had consented to that custody.

In their brief, Respondents suggest that legal custody under the INA requires a court decree, and that, since no decree granted custody to Bagot's father, he could not have had legal custody. Respondents base this argument on the Fifth Circuit's conclusion in *Nehme*, *supra*, 252 F.3d at 427, that the term "legal separation" in § 1432(a)(3) requires a judicial decree of separation, not just living apart under legal circumstances. *See also Brissett v. Ashcroft*, 363 F.3d 130, 133-34 (2d Cir. 2004). By analogy to *Nehme* and *Brissett*, Respondents conclude that a child of divorced parents whose custody has not been determined by a valid court decree is in the joint custody of both of his parents, and therefore cannot meet the requirement of § 1432(a)(3) unless both parents naturalize. *Cf. Wedderburn*, 215 F.3d at 800 (where parents share custody, both must naturalize to create derivative citizenship).

Respondents cite no authority for the proposition that legal *custody*, like legal *separation*, requires a court decree. We think that the two concepts are easily distinguishable, and that there is no inconsistency in requiring a court order for legal separation while allowing legal custody to be based on the consent of the parties or on undisputed physical custody. In fact, at oral argument, counsel for Respondents conceded that *Matter of M—* forecloses the argument that a decree is required to create legal custody: the BIA's longstanding position is that, in the absence of a decree, the parent with actual uncontested custody has legal custody for INA purposes. *See also Bucknor v. Zemski*, No. 01-3757, 2002 WL 442861, *2 (E.D. Pa. Mar. 21, 2002) (rejecting the argument that a court decree is required to establish "legal custody" for derivative-citizenship purposes).

Under the *Matter of M—* standard, Brian Bagot had "actual uncontested custody" of Odiri Bagot after the latter arrived in the United States in 1988. For INA purposes, therefore, he also had legal custody.

## V. Conclusion

We conclude that, when he was naturalized in 1991, Brian Bagot had "legal custody" of Odiri Bagot for the purposes of 8 U.S.C. § 1432(a)(3), because he had actual uncontested custody under *Matter of M—*. Because the other requisites of § 1432(a) were also met, Odiri Bagot gained derivative United States

24

citizenship when his father was naturalized. As an American citizen, Bagot was not deportable, and we will therefore reverse the order of the District Court and remand the matter with directions to issue a writ of habeas corpus.

Bagot v. Attorney General of the United States
No. 04-2127

Rosenn, Circuit Judge, concurring, in which Nygaard, Circuit Judge, joins.

I concur and join in the opinion of the Court, with the exception of Parts III.B.1, III.B.3, and III.C. I write separately because I believe it is unnecessary in this case to grapple with the nuances of "legal custody" under New York law.

The threshold question that must be decided, as I see it, is the validity of the custody decree entered by the New York Supreme Court in the 1984 judgment of divorce granted to Brian Bagot, Odiri Bagot's father. The New York proceedings were essentially in divorce. The divorce proceedings were instituted by Brian Bagot. At the time of these proceedings, Frances Wright, his wife, and their children, including Odiri, a minor, resided in Guyana. They did not appear in these proceedings. As for Brian Bagot, he had emigrated to the United States in 1982, and settled in Brooklyn, New York.

The divorce decree consisted of a brief printed form order dissolving the marriage. As an ancillary measure, the decree stated that "Frances Bagot shall have custody of the children of the marriage." At the time, the children were in Guyana, a foreign country, and in the physical custody of their mother. They did not reside with their father and had not set foot in New York. Thus, although the New York Supreme Court had *in rem* jurisdiction to enter the judgment of divorce, because Brian Bagot had been residing in New York continuously for more than two years, *see* N.Y. Dom. Rel. Law § 230(5) (2004), the court had no *in personam* or subject matter jurisdiction to determine the legal status of Brian Bagot's children. *See Vernon v. Vernon*, 296 A.D.2d 186, 191 (N.Y. App. Div. 2002); *Zwerling v. Zwerling*, 636 N.Y.S.2d 595, 598 (N.Y. Sup. Ct. 1995); *Pavlo v. Pavlo*, 520 N.Y.S.2d 991, 993 (N.Y. Sup. Ct. 1987).

As Judge Becker points out, the New York courts had jurisdiction to make "child custody determinations only if they can meet the higher standards of the Uniform Child Custody Jurisdiction Act (UCCJA), N.Y. Dom. Rel. Law § 75-d(1) (1999)," *repealed by* 2001 N.Y. Laws ch. 386. *Ante*, at 28-29 & n.10. The

26

UCCJA was in effect when the New York Supreme Court entered the divorce decree and fixed the status of the children, and was the governing New York law at all times relevant to this appeal.

Under the UCCJA, much more was required before the court could exercise child custody jurisdiction than *in rem* jurisdiction over one parent for divorce. The New York court could have exercised jurisdiction over Brian Bagot's minor son only if New York were the home state of the child at the time of the custody proceeding, or if New York had been his home state within six months before the commencement of the proceedings and the child had been absent from the state because of his removal or retention by a person claiming custody or for other reasons. *See* N.Y. Dom. Rel. Law § 75-d(1)(a). The court also could have had jurisdiction under the UCCJA if it was in the best interest of the child that the court assume jurisdiction because the child and his parents, or the child and at least one parent, had a significant connection with the state and there was within the jurisdiction of the court substantial evidence concerning the child's present or future care, training, and relationships. *See id.* § 75-d(1)(b). The court might also have had jurisdiction in the event the child had been abandoned or in certain other situations, none of which are relevant here. *See id.* § 75-d(1)(c)-(d).

Thus, for the reasons set forth in Judge Becker's analysis of the foregoing New York jurisdiction statute, we are in agreement that the undisputed facts of this case "lead inevitably to the legal conclusion that the New York Supreme Court lacked subject matter jurisdiction over the custody determination under § 75-d." *Ante*, at 34. *See, e.g.*, *Weyant v. Barnett*, 302 A.D.2d 801, 802 (N.Y. App. Div. 2003) (approving the dismissal of child custody proceeding for lack of jurisdiction under the UCCJA where "substantial evidence concerning the children's care, protection, training and relationships does not exist in New York," the "allegations of emergency [were] insufficient," and "the children had resided with their mother in North Carolina for more than six years . . ."); *see also McBride v. McBride*, 688 So. 2d 856, 859 (Ala. Civ. App. 1997).

Because there was no valid decree of the New York Supreme Court, or as far as this record shows, any other court, giving custody of Odiri Bagot to Frances Wright, his mother, he was not subject to any decree of court fixing his legal custody when

he emigrated to the United States in 1988 and when his father applied for United States citizenship in 1991. I therefore disagree with the Judge Becker that we need to examine the law of New York with regard to parental rights in minor children prior to Brian Bagot's application for naturalization.

Turning to Odiri Bagot's legal status in New York in 1991, when his father applied for naturalization, we are informed that, in 1988, when he was fourteen years old, he and his siblings came to live with their father in New York. Due to poor conditions in Guyana, their mother had agreed that it was in the best interests of the children to transfer physical custody of them to their father, while she remained behind in their home country. Odiri's father provided him with a home, enrolled him in a public school, and otherwise supported him. In 1991, when his father became a naturalized citizen, Odiri Bagot was still a minor, seventeen years old, and still living with his father. As the opinion of the Court concludes, it is clear that his father had actual, consensual physical custody of the boy for derivative citizenship purposes.

Because Odiri Bagot was not born in the United States and had never been naturalized, it is undisputed that his claim of citizenship is derivative upon his father's naturalization. Citizenship in the United States and naturalization proceedings are federal matters and are governed by the federal Constitution and federal statutes. At the time of that naturalization, the Immigration and Nationality Act provided for derivative citizenship of a child permanently residing in the United States while under the age of eighteen upon the "naturalization of the parent having legal custody of the child when there has been a legal separation of the parents." 8 U.S.C. § 1432(a)(3), *repealed by* Child Citizenship Act of 2000, Pub. L. No. 106-395, § 103(a), 114 Stat. 1631. Former § 1432(a)(3) was in effect when Brian Bagot was naturalized and controls this case. *See ante*, at 11-12 & n.3.

In the absence of a judicial decree determining the legal status of a minor child or some other judicial grant of custody, the remaining question in the instant case is whether Brian Bagot's custody of his son satisfies the "legal custody" requirement of § 1432(a)(3) for derivative citizenship purposes. The Bureau of Immigration Appeals considered this precise question in making a status determination in *Matter of M—*, 3 I. & N. Dec. 850, 1950 WL 6650 (BIA 1950). In that case, a child born in Czechoslovakia

in 1929 of alien parents was admitted to the United States as a permanent resident in August 1947. The marriage of her parents had been annulled in 1940 and, as in this case, the child remained abroad with her mother until August 1947. The father came to the United States in 1941 and became a naturalized citizen in 1946. The decree of annulment made no provision for the custody of the child. As in this case, the child's mother orally agreed in 1947 to the father's assumption of custody of the child. In April 1948, the mother stated in an affidavit that the father had obligated himself since August 1947 to educate and support the child to which the mother consented, and that the daughter would remain with her father.

> The BIA held that:
> [I]n the absence of judicial determination or judicial or statutory grant of custody in the case of legal separation of the parent[s] of a person claiming citizenship under section 314(c), the parent having actual uncontested custody is to be regarded as having 'legal custody' of the person concerned for the purpose of determining that person's status under section 314(c).

*Matter of M—*, 3 I. & N. Dec. at 856. Although *Matter of M—* is only a decision of a federal agency, it has not been rejected for over a half-century, and has been the subject of approval of the federal courts. *See Barthelemy v. Ashcroft*, 329 F.3d 1062, 1067 n.4 (9th Cir. 2003) (Where "neither natural parent . . . [has] been awarded legal custody of the child by a court . . ., the parent with physical control of the child will have a claim to 'legal custody' over the child."); *Wedderburn v. INS*, 215 F.3d 795, 797 (7th Cir. 2000) (citing *Matter of M—*, approvingly); *Charles v. Reno*, 117 F. Supp. 2d 412, 417-18 (D.N.J. 2000) (applying "actual uncontested custody" standard of *Matter of M—* where no court order or statutory grant of custody existed).

In the absence of a legal custody decree for a minor child, as we have here, an analysis of child custody law in the State of New York is unnecessary and irrelevant. Indeed, Judge Becker also concludes that "we essentially adopt the entire test of *Matter of M—* in this case, requiring a judicial decree or, failing that, actual uncontested custody." *Ante*, at 27 n.9.

Judge Becker believes that he is compelled to explore New

York law concerning legal custody of a minor child, even in the absence of a legal decree, based on his understanding of *Fierro v. Reno*, 217 F.3d 1(1st Cir. 2000). However, unlike our situation here, a state probate court in *Fierro* had issued a valid custody decree. *See Fierro*, 217 F.3d at 4. Here, there is none. By contrast, in 1991when Brian Bagot applied for naturalization, the not-uncommon relationship existed where parents consensually agreed upon the physical, uncontested custody of a minor child.

The opinion of the Court ultimately concludes that "it is clear" that Brian Bagot had "legal custody" of his son, Odiri, for derivative citizenship purposes. *Ante*, at 37-38. The opinion of the Court also rejects the Respondents' argument that "legal custody," like "legal separation," requires a court decree. *Ante*, at 39. I fully agree with both propositions.

Accordingly, we agree that when he was naturalized in 1991, Brian Bagot had legal custody of his son, Odiri, for derivative citizenship purposes. Because all other requisites of § 1432(a) were also met, Odiri obtained derivative United States citizenship when his father was naturalized. Odiri Bagot, therefore, is not deportable and the Order of the District Court should be reversed and the case remanded to the District Court with instructions to issue a writ of habeas corpus.